[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 789 
Atif Mitchell was charged in a three-count indictment with the following counts of capital murder: count one, shooting Demarcus King, see § 13A-5-40(a)(17), Ala. Code 1975, "[m]urder committed by or through the use of a deadly weapon while the victim is in a vehicle"; count two, shooting Omarfio Houston, see § 13A-5-40(a)(17), Ala. Code 1975; and, count three, causing the death of both Demarcus King and Omarfio Houston, see § 13A-5-40(a)(10), which makes capital the offense of "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct." The jury convicted Mitchell of the lesser included offense of felony murder on all three counts. The trial court stated on the case action summary sheet that "there can only be one sentence since there is only one case" and stated that "the verdicts in counts I and II are [considered] advisory."[1] C.R. 6. The trial court sentenced Mitchell to life imprisonment on count III of the indictment. Mitchell raises seven issues on appeal. Because Mitchell challenges the denial of his motion to suppress certain evidence, the sufficiency of the evidence to sustain a conviction, the appropriateness of one of the jury charges, the prosecutor's conduct, and an alleged fatal variance between the indictment and proof presented at trial and because he was not identified as a participant by direct testimony from witnesses at the crime scene, we believe we must present the facts in great detail.
 FACTS
On June 16, 1993, at approximately 1:00 a.m., the bodies of Demarcus King and *Page 790 
Omarfio Houston where discovered in a van parked in an alley near the corner of 14th Street and 6th Avenue North in Birmingham, Alabama. Houston's body was found inside the van, slumped against the driver's seat. The passenger's side door was open and King was partly in the van and partly on the ground outside the van.[2] There were 10 bullet holes in the driver's side door. The van had been wrecked on the front passenger side. Shell casings from .380 caliber bullets, lead from the bullets, glass fragments from the van's headlights, orange plastic lens material from a side turn signal marker, and a splash guard that was determined to be from a 1981-1989 burgundy Chevrolet Caprice or Pontiac Parisienne were found on the ground near the van.
Houston was pronounced dead at the scene. His body had sustained 10 bullet wounds. Seven .380 caliber bullets, all fired from a .380 caliber gun, were removed from Houston's body. King suffered from two bullet wounds. He was treated by paramedics and taken to the hospital, where he soon died. A 9mm. bullet core and a 9mm. bullet jacket, both fired from a 9mm. gun, were removed from King's body.
Mitchell did not dispute that the automobile identified by witnesses as the get away car, was a burgundy Chevrolet Caprice that he had borrowed from an individual named Isaac Lamont Ruffin. He did not dispute that he was present when Houston and King were shot, nor did he dispute that his 9mm. gun may have fired the lethal bullet into King. In dispute is whether Mitchell participated in the commission of the crime. Several witnesses testified at trial and at the motion to suppress. A summary of their testimony follows.
Julia Whisonant testified that she was a cable splicer working between 5th Avenue North and 6th Avenue North on 14th street at the time of the murders. She said that at about 1:00 a.m. she heard what to her sounded like firecrackers. She determined the sound to be actual gunfire. When she heard the noise a second time she looked up and saw a green Volkswagen van and a burgundy or brown General Motors car. This car was later identified as a burgundy Chevrolet Caprice. There was one person in the Chevrolet. R. 302, 306. Two people were standing close to the Volkswagen. R. 303. "There was a driver in the [Chevrolet]. You could barely see the top of his head . . . over the headrest in the car." R. 305. Mitchell testified that he was six feet four inches tall and weighed 235 pounds. The horn of the Volkswagen van started blowing and she "knew [the shooting] was pretty much over with then." R. 303.
She saw "the two people that were outside closest to the Volkswagen return to get in the [Chevrolet] that was waiting on them to leave." R. 303. The person on the right side of the Volkswagen "walked all the way around and got into the left rear of the car on the driver's side. The . . . person . . . on . . . the left side of the Volkswagen . . . got into the front passenger's side of this car." R. 304-05. Whisonant said that the person who was on the right side of the Volkswagen was tall and heavyset. He had extremely large shoulders and must have been some type of weight lifter because his shoulders were pretty much squared up. The other person was a small person, "just your average built person." R. 307. She described both persons as males with dark completions. R. 307. The car left the scene at what Whisonant described as a fairly normal speed and turned left onto 8th Avenue.
On cross-examination, Whisonant testified that in a prior statement given to the police she had described the larger of the two persons as being 5 feet 10 inches tall and weighing 180 to 200 pounds, "more short and kind of stubby." R. 315.
Lewis Bradley, a probation and parole officer for the State of Alabama, testified that on June 16, 1993, at around 1:00 a.m., he was in his automobile stopped at a traffic light at the corner of 6th Avenue North and 14th or 15th Street. He heard what sounded like "a bunch" (R. 321) of firecrackers going off and looked down the street and saw someone *Page 791 
shooting into a green Volkswagen. The Volkswagen was parked in the alley and a car was approximately 15 or 20 yards beyond the Volkswagen near the middle of the street. R. 322. The shooter was "coming from behind the [Volkswagen] and shooting into it." R. 320. Bradley said he saw "fire coming out of the weapon." R. 320. The shooter "ran from behind the [Volkswagen] to another vehicle that was parked in the street . . . . [and the shooter] got in the vehicle on the passenger's side . . . and the vehicle sped off." R. 320. The car proceeded to 8th Avenue and turned left. Bradley could not describe the shooter's vehicle and did not know how many people were in the vehicle.
Donna Glenn testified that on June 16, 1993, at around 1:00 a.m., she and a friend were travelling in an automobile on 14th Street near the alley at 6th Avenue. She was driving. She said that she saw a Volkswagen van parked between the alley and the sidewalk and that a burgundy Chevrolet had it blocked in. The Chevrolet had part of the street blocked, so Glenn had to drive around it. Two young men were seated in the front seat of the Chevrolet. Glenn stated that at one time she thought she might have seen three people in the Chevrolet, "but she wasn't for sure." R. 335. However, she said that "[she] kn[e]w there w[ere] two [people] in the front." R. 339. She did not see anyone in the Volkswagen van. As she approached the Chevrolet she "saw a young black man get out . . . of the driver's seat" of the Chevrolet. R. 331, 332. She had passed the cars and was looking in her rearview mirror when she saw the man who had gotten out of the driver's seat walk between the Chevrolet and the Volkswagen van "and [go] around to the driver's side of the Volkswagen." R. 334. Glenn said that she had driven a short distance past the Volkswagen van when she heard "a whole bunch" of gunshots. R. 333. The other man in the Chevrolet slid over to the driver's side. The man who got out of the car was about 5 feet and 11 inches, slim, with a hump in his nose, and his throat stuck out.
Glenn stated that there were no bullet holes in the Volkswagen van when she passed it the first time. After the shooting she and her friend went to get some beer. They passed the scene a second time after getting beer and saw bullet holes in the Volkswagen van. A couple of days later she contacted the police because a news report had identified her car as leaving the crime scene. On cross-examination Glenn testified that the appellant was not the man she saw getting out of the Chevrolet. R. 345.
Charles Smith was the passenger riding with Donna Glenn at the time of the incident. He testified that he saw the Chevrolet[3] bump the Volkswagen. R. 373. "After it bumped the Volkswagen . . . we passed on by . . . [t]hen the shots fired." R. 374. Smith said it sounded like two guns firing. He looked in the rearview mirror and saw two men standing in front of the Volkswagen. He saw a short man on the passenger side of the Chevrolet. He thought, but he was not sure, whether he saw another man, a taller man, standing on the driver's side of the Chevrolet. In a moment the Chevrolet, travelling fast, passed Glenn and Smith on 14th Street and turned left on to 8th Avenue.
On cross-examination Smith stated that he had given a defense investigator and Detective Long tape-recorded statements. He said that in these statements he said that he saw only one man standing outside the vehicles but that there could have been two men. Smith stated on cross-examination that he was certain that one man was a "kind of short, dark skin, not fat" person, who was wearing short pants. R. 380. This man got into the Chevrolet on the passenger side but Smith did not know if it was the front or back seat. After repeated questioning on cross-examination, Smith concluded, "What I'm basically saying is when I looked in the rearview mirror I know I saw one guy, may have been two. I'm not sure." R. 391. The tape-recording given to Detective Long was played for the jury. In Smith's taped statement he said "I just saw that one figure." R. 393. *Page 792 
Evelyn Drake, an evidence technician for the Birmingham Police Department, also testified. She said that when she arrived at the crime scene one victim was in the driver's seat of a Volkswagen van and another victim had been taken to the hospital. She took photographs and collected evidence at the crime scene. She collected shell casings from .380 caliber bullets and glass fragments from the Volkswagen's front end, and glass fragments from another vehicle. She stated that it appeared that the Volkswagen van had hit another car. She also collected glass fragments, bullet fragments, and a bullet from inside the Volkswagen van. Drake recorded 10 bullet holes on the driver's side of the Volkswagen van. Drake did not discover any bullet holes on the passenger's side of the Volkswagen van. All of the shells were recovered from the driver's side of the Volkswagen van. R. 435.
Dawn Lacy, a Birmingham Police detective, supervised the evidence technician in this case. She identified a box containing a headlight frame and a chrome panel that had been removed from a 1981 Chevrolet Caprice Classic belonging to a friend of Mitchell's named Isaac Lamont Ruffin. The headlight frame had been removed from the front passenger side and wrapped to the quarter panel. These items were sealed and taken to the Alabama Department of Forensic Sciences.
Wayne Burrows, a forensic scientist in the area of trace evidence[4] examinations employed by the Alabama Department of Forensic Sciences in Birmingham, examined evidence submitted to the Department of Forensic Sciences in this case. Of the several items submitted for testing, he determined that the five pieces of orange plastic lens material removed from the crime scene came from a side turn signal marker of a 1981 through 1989 Chevrolet Caprice, or a 1981 through 1989 Pontiac Parisian. R. 441.
He also examined the automobile headlight frame and chrome panel that had been taken on July 21, 1993, from Ruffin's 1981 Chevrolet Caprice Classic. The orange side turn signal marker lens on the quarter panel was broken. Burrow concluded that at least three of the five orange lens pieces removed from the crime scene came from Ruffin's Chevrolet Caprice Classic. R. 444.
Doctor Robert Brissie is a professor of pathology at the University of Alabama Birmingham and is the chief coroner and medical examiner in Jefferson County. On June 16, 1993, he performed autopsies on the bodies of Omarfio Houston and Demarcus King. Brissie's autopsy revealed that Houston suffered 10 bullet wounds — 7 penetration wounds and 3 graze wounds. Each wound appeared consistent with a wound inflicted by a ricochet bullet or a bullet that had passed through another object before striking Houston. R. 458, 503, 504. It was Brissie's expert opinion that Houston died of multiple gunshot wounds. R. 490. Brissie's autopsy of King revealed that King had been shot twice. A bullet core and a bullet jacket were removed from King's body. It is possible that the two wounds could have resulted from the same shot. R. 504. Each wound appeared consistent with a wound inflicted by a ricochet bullet or a bullet that had passed through another object before striking King. R. 458, 503, 504, 508. It was Brissie's opinion that King died of a gunshot wound to his left side. Brissie stated that each victim had a number of glass-caused wounds, consistent with the bullets having been fired through glass. R. 504. He also stated that the path of every bullet wound indicated that the bullets entered the victims' left sides and travelled to the right. R. 505, 508.
David Higgins, who examines firearms and toolmarks for the Alabama Department of Forensic Sciences in Birmingham, examined the bullets and fragments recovered by Dr. Brissie. Higgins determined that all of the bullets and fragments recovered from Houston's body were .380 caliber bullets and that they were fired from the same handgun. *Page 793 
The bullet core and the bullet jacket recovered from King's body were determined to have separated from one another. They were determined to be 9mm. and to have been fired from a 9mm. handgun. Higgins also testified that a Tec-9, which Mitchell testified he had in his possession on the night of the killings, is a 9 mm. handgun.
Officer Johnny Long, a Birmingham police officer, was assigned to investigate the killings. He testified that he interviewed two men who had been dressed like females who had been talking to Houston and King shortly before they were shot. R. 575. No evidence was presented concerning these individuals statements to Long. He testified concerning the condition of the Volkswagen van, the submission of debris from the scene to the Department of Forensic Sciences, and the receipt of information from the Department leading to the identification of Isaac Lamont Ruffin's burgundy Chevrolet Caprice Classic.
Based on his investigation, Long began looking for a 1981-1989 burgundy Chevrolet Caprice Classic that was damaged on the front passenger side. At some point in early July, he saw a car fitting this description travelling on I-59. He followed the car until it stopped at a grocery store on Arkadelphia Road and he talked with the driver. The driver was Isaac Lamont Ruffin.
Long tape-recorded a statement from Ruffin on July 23, 1993. Ruffin stated that Mitchell had borrowed his car and that he was alone when he borrowed it. However, Long testified that later in the evening, after the taped statement, Ruffin "told him something different." Ruffin said at this time that Mitchell was not alone when he borrowed his car. R. 580. Long said that he did not put this in his notes because another witness had told him that Mitchell was not alone. R. 581. Long was not asked to identify this witness.
On July 23, 1993, following his interview with Ruffin, Long interviewed Mitchell. Before the interview Mitchell was read his constitutional rights. R. 539. He asked that his father be present. The police complied with his request. Long stated that there was some conversation with Mitchell and with his father "both before and after the tape recording." R. 546. Long said Mitchell's father "offered to do everything he could to help find [a person Mitchell identified as D., who Mitchell said committed the killings]. . . . They didn't know who [D.] was or where he lived except for D. And I explained to them I didn't want them to get that involved in it. That if Mitchell's father did see D., to call us and let us handle it." R. 547.
Mitchell was interviewed in the presence of his father. R. 539. Long said that Mitchell's father told him to tell the truth. R. 569. This interview was taped and the tape-recording was entered into evidence as the State's Exhibit 43. R. 539. The tape was played for jury.
During the interview, Mitchell told Long that he was afraid of D.; R. 549. Mitchell did not mention on the tape the presence of a third person and Long stated that he did not remember Mitchell's mentioning a third person at any time, but that he may have. R. 582. Long testified that Mitchell had told him that "these persons, plural, ran and jumped in the car and told him to drive off" after the shooting. R. 584. Mitchell said that D. hung out in the "brickyard." The brickyard is the nickname for a housing project in Ensley. R. 694. Mitchell gave Long a description of D.; R. 554-55. Shortly after the interview, Mitchell was arrested, charged with capital murder, and placed in the juvenile detention center. Long said that as a result of the interview the police made an effort to locate the individual the appellant called "D."
It was subsequently determined that "D." was Damion Dawson. D. was found at some point in September 1993. R. 556. According to Long, D. lived with his grandmother in Fairfield. D. said he was a student at Miles College, but an incident report indicated that D. was 16 at the time of the shootings. Long said that he left word with D.'s grandmother that he wanted to talk to D. and that D. telephoned him. On September 22 or 23, 1993, D. was included with five other people in a lineup conducted at the family court juvenile detention center. Mitchell viewed *Page 794 
the lineup but told the officers that he did not know anyone in the lineup. However, D. told the officers that he knew Mitchell. R. 586.
Isaac Ruffin gave the following testimony. He lives at 1688 18th Place Southwest, in what is known as the "West End" area of Birmingham. Ruffin said that he has known Mitchell since Ruffin was in the eleventh grade, at which time Mitchell was in the ninth grade. Ruffin testified that Detective Long stopped him at a grocery store and asked him about the damage to the car. The police searched the car and took samples to be tested. One or two weeks later, on July 23, 1993, at about 9:00 a.m., the police took Ruffin to the police station for questioning. He was kept at the police station until about 4:00 p.m. Ruffin said the police told him that he was being questioned concerning a capital offense and that he could go to the electric chair. R. 364. Ruffin said that he heard Detective Long tell Mitchell that he could go to the electric chair. R. 364-65.
At 10:55 a.m., on July 23, 1993, Ruffin gave Detective Long a tape-recorded statement. Ruffin stated on the tape that he believed that Mitchell was alone when he borrowed the car. R. 368. Later, after giving the taped statement, Ruffin told Long that there was somebody with Mitchell when he borrowed the car.
At trial Ruffin gave the following testimony. One evening in mid-June 1993, about 11:25 p.m., Mitchell and "a short dark-skinned guy" (R. 350), whom Ruffin had never seen before, drove up in Mitchell's older model automobile. Ruffin was not introduced to Mitchell's companion and they did not speak. Ruffin did not see any weapons but he did see a "bulge" in the companion's shirt. He testified that he had seen Mitchell carrying a gun before and that he had been to the shooting range with Mitchell and Mitchell's father.
Mitchell said that he wanted to borrow Ruffin's burgundy 1981 Chevrolet Caprice Classic automobile to see a girl who lived in Bessemer. The car actually belonged to Ruffin's father. At about 11:45 p.m., Ruffin and Mitchell exchanged car keys and Mitchell and his companion drove away in the burgundy Chevrolet Caprice Classic. Mitchell was driving. The car was in good condition and the turn signal marker was not broken. Approximately two hours later Mitchell returned the car. The same man was with him. Ruffin did not look to see if the car had been damaged. Ruffin's father later showed Ruffin the damage on the car. There were little dents around the headlight on the right side and an orange turn signal marker was damaged. Ruffin assumed the car got hit while parked on the street and did not think anything about it until the police questioned him on July 23, 1993.
Mitchell testified on his own behalf. He stated that he had previously met a girl at a skating rink who lived in Bessemer. At some point on June 15 or 16, 1993, he decided to visit her. He borrowed Ruffin's car because a tire on his car had a bubble in it and he did not have a spare tire. He also said that he did not want to risk tearing up the expensive rims on his car if the tire blew out. He said that no one was with him when he went to Ruffin's house and that he drove alone to Bessemer but could not find the girl's house. He left Bessemer and drove back down by the 8th Avenue Plaza to try to buy some beer but he could not get any because he was not old enough. He saw D., who was with someone else. D. asked where Mitchell was going and the appellant told him that he was going to ride around by the clubs. D. asked if he could ride with him. Mitchell said that he had met D. about two weeks earlier but he indicated that he did not know D. well. There was a man with D., whom D. introduced as "my partner, T." R. 628. D. got into the passenger seat and T. got into the backseat behind the driver. Mitchell was driving. He said that he was carrying a Tec-9mm. gun at this time. He explained that he carried the gun for protection because two of his friends had been killed during carjackings. He did not have a license to carry a gun and his parents did not know that he had a gun. When D. got in the car he ask Mitchell if he had "any protection." D. asked to see the gun and Mitchell told him it was under the seat. D. put the gun in his lap. They drove on 8th Avenue Plaza, where Mitchell said they saw some *Page 795 
girls walking. D. told Mitchell that those people were actually men, not girls. According to Mitchell, they "made a right at the corner to try to see . . . and we came around, and we pulled up in the alley, and that is when we saw the green Volkswagen in the alley, and the guy in the car [D.] was talking to — the guys in the [Volkswagen] — ." R. 631-32. The girls were already walking away. R. 707. Mitchell said he had never seen the two boys in the Volkswagen before. Mitchell continued with the following testimony.
 "We came to a standstill because we were trying to go up in the alley, and the car was in the alley and another car, the green Volkswagen was in the alley standing still. So D. rolled down the window and said move the F__________ out the way. And then the other guys rolled down the window and told him they wasn't going to move, told him 'We ain't going nowhere.'
 "Then D. was, like, getting mad saying, 'No, he just ain't going to get to me like that.' Then he started pointing the gun out the car. And as he was opening the door, he was pointing the gun while he was opening the door, then he ran out and went up to the car and tried to bust the windows [with the gun. . . . The driver of the Volkswagen had rolled his window back up].
". . . .
 "After [D.] tried to break the window, there was shots right after that. I tried to back up. I told him — when I said, 'Man, I'm going to back up, man, let's leave it alone.' I started backing up. And then I started coming out the alley then, and facing forward all the way straight. And then the [Volkswagen] hit the [Chevrolet] that I was driving, and at the time that the car was hitting the shots were being fired then."
R. 633-34, 635-36.
Mitchell stated that T. got out when D. got out of the car. They went to the driver's side of the Volkswagen. Mitchell said that D. had his .380 caliber gun and Mitchell's Tec-9 when he got out of the car. Mitchell did not know when D. pulled out the .380. Mitchell said he did not see the .380 when D. was beating on the window of the Volkswagen. R. 711. He did not see the .380 until D. was coming back to the car. R. 712.
Mitchell stated that he had no idea what D. was going to do when he got out of the car until D. pulled the trigger. Mitchell said that D. was firing the shots at the boys seated inside the Volkswagen. Mitchell stated in his tape-recorded statement that D. was "probably four or five feet" away from the Volkswagen when he started firing the "guns." However at trial, Mitchell testified that he did not see D.'s hands during the shooting and he does not know if two guns were fired. R. 687. Mitchell is 6 feet 4 inches tall and weighs 235 pounds. He does not know if he was sitting slumped over or straight up in the driver's seat during the shooting. R. 687. He does not know if his head was visible over the dashboard. He said that he never got out of the car and that he sat in the driver's seat the entire time. R. 721. Mitchell stated that he was not trying to help D. get away. He said that "[b]y the time I came to my senses to even drive off, they were back in the car." R. 638.
According to Mitchell, nothing was said for four or five blocks, then D. took the bullets out of Mitchell's 9mm. gun and threw them out of the window. D. placed the .380 caliber gun in his lap with the barrel facing Mitchell. Then D. said to Mitchell, "You didn't see anything. If anything get[s] back to me if I find out you [are] snitching, anything, I'm going to blow the car up with you in it." R. 639. Mitchell said that he had just watched D. kill two boys and was afraid D. would kill him too. D. told Mitchell to drop him and T. off at the brickyard. Mitchell said that he saw D. the next day but they did not speak. On another occasion D. asked Mitchell why he did not come around anymore and if he had been "snitching." R. 642. Mitchell told D. that he had a job and that he had not told anybody anything about the murders. Mitchell said about two months before trial he and his younger brother were in an automobile and D. pulled up beside them and pointed a gun at Mitchell and stated, "Yeah, I'm still watching you." R. 644. Mitchell said he did not identify D. in the lineup *Page 796 
because he wanted to protect himself and his family.
Mitchell said he bought the Tec-9 "a few months" before the shootings. R. 663-4. He described a Tec-9 as having "a little pistol grip" and a long magazine, like a sub-machine gun. R. 664. Mitchell said that he knew the gun was semiautomatic because the person who had sold it to him told him it was and because it was firing one shot at a time when D. was shooting it. R. 669. Initially he said he did not know how many rounds were in the magazine on the night of the incident but then he said that he had been given 13 9mm. bullets from "off the streets" and had put them in the magazine. Mitchell said that he had never shot the gun, and that he kept the gun in a plastic zippered case underneath the driver's seat of his car. Mitchell said that he carried the gun from his car to Ruffin's car when they swapped keys. At some point before Mitchell was questioned on July 23, 1993, he had sold the Tec-9 for $150. He knew that the gun was evidence of a double murder. R. 717-18.
Mitchell described T. as being dark skinned, kind of muscular, with a "faded" hair cut, about 5'10" or 5'11" tall. Mitchell said that he did not tell Detective Long on the tape that a third person, T., had been with him and D.R. 678. Mitchell does not know whether T. fired any shots. Mitchell did not say anything about T. initially because he was afraid D. would find out. Later, he said he told the police about D. because D. said he was going to kill him and he did not tell the police about T. because he did not know T.R. 691, 693. Mitchell stated that he was not fabricating T. just because a witness had said that two people got in the Chevrolet after the shots were fired instead on one. R. 692.
Paulette Rich, Mitchell's neighbor, testified that she was at the police station for two hours the afternoon Mitchell was questioned. She stated that Mitchell's father was not immediately allowed to see Mitchell when he arrived at the police station. She recounted that it was "a long time" before his father was allowed to see Mitchell. R. 78. She said that Long told his father that Mitchell was being questioned by the police. Long also told his father that the police "had got some explanation from some drag queen saying that [Mitchell] didn't do the shooting and [Long] felt like [Mitchell] was not the one that did it, and [Mitchell] was from a good family, or something." R. 79.
Mitchell's father testified that he was working in Cullman when his office contacted him and told him that the police had taken Mitchell in for questioning. Mitchell's father stated that it took between one hour and fifteen minutes and one and one half hours for him to get to the police station. He was taken to Detective Long's desk and told that the police were holding Mitchell in a room and that they were questioning him concerning a homicide. He said it was about 25 minutes before he was allowed to see Mitchell. He saw an officer escort an older man to the room Mitchell was in. The man looked inside, pointed, and was then taken away. Mitchell's father was introduced to Lieutenant Cooley.[5] Cooley told him that Mitchell was being questioned about a double homicide. At that point he was allowed to talk to Mitchell.
According to Mitchell's father, the first thing Mitchell did when he and Long walked into the room was ask for his mother. Detective Long heard this request. Mitchell had been crying, was nervous, and was shaking. Long left the room and Mitchell told his father that he did not do anything and his father told Mitchell that they would "get it all straight." R. 87. At about that point Detective Long came back into the room. Mitchell's father and Long left the room and Long told him that the police knew Mitchell was at the crime scene because they had a witness who saw him there. Long said the police knew that Mitchell was not the shooter and they wanted Mitchell to help them find the shooter. R. 88. His father said that "at that point I felt I was led to believe that any cooperation that . . . Atif gave them, would lead to his immediate release." R. 88. Mitchell's father went back inside the room and talked to Mitchell and Mitchell told him what he knew about the shootings. Then *Page 797 
Long came in with a tape-recorder and said that they were going to record his statement. When the tape-recorder was turned off, Mitchell's father went outside. Cooley "reemphasized that they knew [Mitchell] was not the shooter, and that they wanted his cooperation for that fact." R. 90. According to Mitchell's father, Cooley was being sympathetic by saying that he knew what he was going through and relating a story about a friend's child. Cooley told Mitchell's father not to worry about a thing. Mitchell's father said he sat at Long's desk for about 10 minutes before Long told him that they were charging Mitchell and that Cooley said they were not going to allow Mitchell to go home. R. 93.
Mitchell's father stated that he felt promises had been made to Mitchell in return for Mitchell's statement. According to him, Long told him that he knew Mitchell did not commit the murder and that the police were looking for the shooter and Cooley had told him the same thing and had also told him that they needed Mitchell to help them find the shooter. R. 102. Mitchell's father told Mitchell these things and Mitchell gave a statement to help the police find the shooter. R. 105.
Mary Porter, a former neighbor who has known Mitchell all his life, testified that he had a good reputation in the community and a good reputation for telling the truth. R. 738.
Mary Bailey, a teacher at John Carroll for approximately 20 years, testified that she had taught Mitchell in four classes over three years. She stated that the appellant's classroom reputation in her classes was very good. R. 618.
Chris Deshazo was called by the defense, and stated that during his investigation at the scene he encountered a man dressed like a woman. R. 782.
 I.
Mitchell contends that the trial court erred in denying his motions for a judgment of acquittal, based on allegedly insufficient evidence, made at the close of the State's case-in-chief and after both sides rested. Because the jury acquitted Mitchell of capital murder, we will address only that portion of Mitchell's insufficiency of the evidence argument that it pertains to felony murder.
 " 'In determining if the evidence of the state is sufficient to sustain a verdict, the trial court should consider only the evidence before the jury of the facts at the time the motion was made, and must consider it most favorably to the state. When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit the case for the jury to determine the weight it will give the evidence. . . .' "
Mitchell v. State, 570 So.2d 738, 739 (Ala.Cr.App. 1990) (quoting Sullivan v. State, 441 So.2d 130,135 (Ala.Cr.App. 1983)).
Mitchell contends that the State failed, on each count, to prove beyond a reasonable doubt the elements of felony murder. Felony murder is committed when a person commits any felony "clearly dangerous to human life and, in the course of furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person." § 13A-6-2(a)(3), Ala. Code 1975. " 'In the typical felony-murder, there is no malice in "fact," express or implied; the malice is implied by the "law." What is involved is an intended felony and an unintended homicide.' " Johnson v.State, 620 So.2d 679, 701 (Ala.Cr.App.), rev'd on other grounds, 620 So.2d 709 (Ala. 1993), on remand, 620 So.2d 714
(Ala.Cr.App. 1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285,126 L.Ed.2d 235 (1993) (quoting Ex parte Bates, 461 So.2d 5, 7
(Ala. 1984)) (emphasis in Bates).
The underlying felony is discharging a firearm into an occupied vehicle. The statute prohibiting discharging a firearm into an occupied vehicle states: "No person shall shoot or discharge a firearm, explosive, or other weapon which discharges a dangerous projectile into any occupied . . . automobile . . . in this state." § 13A-11-61(a), Ala. Code, 1975. Discharging a firearm into an occupied vehicle is a Class B felony. § 13A-11-61(b), Ala. Code, 1975. Firing gunshots into an occupied vehicle is clearly dangerous to *Page 798 
human life. The undisputed evidence in this case is that gunshots were fired into the vehicle occupied by Houston and King and that they were thereby killed.
Mitchell argues that the State failed to prove that King was inside the vehicle when he was shot. We disagree. Mitchell testified that two young men were in the Volkswagen van when the shots were fired. Also, Dr. Brissie's testimony indicated that both victim's were inside the Volkswagen when they were shot. He testified that each wound appeared to have been inflicted by a ricochet bullet or a bullet that passed through another object before striking the victim. He said that the victims' wounds were consistent with wounds caused by bullets fired through glass. He also stated that the path of every bullet wound indicated that the bullets entered the victims' left sides and travelled to the right. In addition to Mitchell's testimony, the testimony of Dr. Brissie supports the conclusion that King was inside the Volkswagen when he was shot.
Mitchell contends that the State's evidence was insufficient to support a conviction for felony murder based on a theory of complicity. Mitchell argues that the State failed to prove that he was a knowing participant in the furtherance of the underlying felony and that it failed to prove that he intentionally committed the underlying felony of discharging a firearm into an automobile, thereby causing the death of another person.
 " 'A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense . . . [h]e aids or abets such other person in committing the offense . . . ' § 13A-2-23(2), Code of Alabama 1975. ' " 'Aid and abet "comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary." ' " Gwin v. State, 456 So.2d 845, 851 (Ala.Cr.App. 1984), quoting Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911). See also Watkins v. State, 495 So.2d 92
(Ala.Cr.App. 1986).' Jones v. State, 623 So.2d 389, 391 (Ala.Cr.App. 1993)."
Turner v. State, 674 So.2d 1371, 1375-76 (Ala.Cr.App. 1995) (emphasis in original). "[T]he offense of shooting a firearm into an occupied vehicle does not require proof of specific intent." Hawkins v. State, 594 So.2d 198, 201-02 (Ala.Cr.App. 1991) (citing § 13A-11-61, Ala. Code 1975). If the jury did not believe Mitchell's version of the incident, then the jury had to decide whether Mitchell acted as a principal or as an accomplice in the commission of felony-murders or capital murders.
At the time the State rested and the appellant made his first motion for a judgment of acquittal, the jury had heard Mitchell's tape-recorded statement in which he stated that he was driving the Chevrolet on the night of the killings and that he was present during the killings of Houston and King. Donna Glenn had testified that she saw the driver of the Chevrolet get out and approach the driver's side of the Volkswagen van and that she then heard gunshots. Charles Smith had testified that he had heard two guns firing. King was killed by 9mm. bullets. Mitchell had a 9mm. gun. This evidence, considered most favorably to the State, is legal evidence from which the jury could infer that the defendant was guilty of felony murder. The trial court correctly denied the motion for a judgment of acquittal at this time.
By the conclusion of all the evidence it was undisputed that gunshots were fired into the vehicle occupied by Houston and King, killing them. The testimony of witnesses, including Mitchell, established this fact. It is undisputed that Mitchell was at the scene of the killings. King was killed by a shot fired from a 9mm. gun. Mitchell admitted that he had a 9mm. gun with him at the time of the shootings. However, Mitchell said that D., or maybe T., had fired his gun. Mitchell sold the gun after the incident. In this case, one witness testified that he saw only one participant, while other witnesses saw at least two and maybe three persons. One witness identified the driver of the Chevrolet as the shooter. Mitchell testified that he was the driver of the Chevrolet.
Mitchell denied all involvement in the shootings and placed the entire blame on an individual known only as D. It does not *Page 799 
appear from the record that Mitchell placed any emphasis on the presence of D.'s alleged companion, an individual Mitchell called T., until he testified at trial. Mitchell claims that he did mention the presence of T. to the police during their questioning of him on July 23, 1993. The officer questioning Mitchell did not remember whether T. had been mentioned. The officer remembered only Mitchell's talking about someone he called D. Mitchell did not identify D. in a police lineup when given the opportunity to do so. However, D. told officers at the lineup that he knew Mitchell. " 'A false explanation given by the accused of any suspicious fact or circumstance tending to connect him [or her] with the offense is admissible in evidence against him [or her]. . . . The jury may properly consider conflicting statements as indicating a consciousness of guilt.' " Bankston v. State, 620 So.2d 115, 119 (Ala.Cr.App. 1992) (quoting Cumbo v. State, 368 So.2d 871, 876 (Ala.Cr.App. 1978)).
Depending on which witnesses the jury believed, there was testimony presented from which the jury could have found Mitchell guilty at least on the theory of complicity. "The weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury. . . . A defendant's guilt may be established by circumstantial evidence as well as by direct evidence."Smith v. State, 698 So.2d 189 (Ala.Cr.App. 1996). Sufficient evidence was presented to allow the jury to decide whether the appellant committed or assisted in these killings.
 II.
The appellant contends that the trial court erred by charging the jury on the lesser included offense of felony murder. The following objection was made at the charge conference regarding felony murder.
 "Your honor, we would object to that at the appropriate time. Two grounds. One, not lesser included offense. And two, is not in any event lesser included offense through this evidence and these circumstances because of the fact that there is no proper showing by the evidence that [Mitchell] . . . had anything to do with the shooting into the vehicle, any knowledge whatsoever."
R. 772-73.
"[A] specific objection made at the charge conference is sufficient to preserve the issue under Rule 21.2, [A.R.Crim.P]."[6] Molton v. State, 651 So.2d 663, 666 (Ala.Cr.App. 1994) (where "a defendant clearly objects at the charge conference to the trial court's refusal to give a written requested charge and states specific reasons for that objection, he is not required to renew his objection at the close of the oral instructions to preserve that issue for appellate review."). At the conclusion of the court's oral charge, which included a charge on felony murder, the defense stated, "Satisfied, your Honor." R. 959. The jury then retired to deliberate. Later, at the jury's request, the trial court recharged the jury on complicity, capital murder, and felony murder. At this time the defense objected to the felony murder charge, stating, "The first ground is that felony murder should not be a lesser included offense of any of these three charges." R. 992. Normally, "[a] request to instruct or an objection to an instruction that is made when the jury returns with a question or for re-instruction is untimely." Smith v.State, 601 So.2d 201, 206 (Ala.Cr.App. 1992) (citing Goins v.State, 521 So.2d 97, 98-99 (Ala.Cr.App. 1987)). However, because the appellant objected at the charge conference he was not required to renew his objection at the close of the oral instructions to preserve that issue for appellate review.
The trial court properly charged the jury on the lesser included offense of felony murder. "An offense is an included one if . . . it is established by proof of the same or fewer than all the facts required to establish the commission of the offense *Page 800 
charged. . . . It differs from the offense charged only in the respect that . . . a lesser kind of culpability suffices to establish its commission." § 13A-1-9(a)(1) and (4).
 " 'It is clear that "[a] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position." Ex parte Oliver, 518 So.2d 705, 706 (Ala. 1987). This is true regardless of "however weak, insufficient, or doubtful in credibility" the evidence concerning that offense. Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978). When there is evidence that would support a charge on a lesser included offense, the defendant is entitled to the charge "even where 'the defendant denies the charge,' Ex parte Pruitt, 457 So.2d 456, 457 (Ala. 1984), and [where] 'the evidence supporting the defendant's position is offered by the State.' Silvey v. State, 485 So.2d 790, 792
(Ala.Cr.App. 1986). Accord, Ex parte Stork, 475 So.2d 623, 624 (Ala. 1985)." Starks v. State, 594 So.2d 187, 195 (Ala.Cr.App. 1991).' "
Hutcherson v. State, 677 So.2d 1174, 1196 (Ala.Cr.App. 1994) (quoting Fletcher v. State, 621 So.2d 1010, 1019-22
(Ala.Cr.App. 1993)).
Mitchell was charged with two counts of murder made capital because the murder was committed by shooting into an occupied vehicle, and one count of murder made capital because two or more persons were murdered by one act or pursuant to one scheme or course of conduct. Felony murder committed by shooting into an occupied vehicle is a lesser included offense to the capital offense of "[m]urder committed by or through the use of a deadly weapon while the victim is in a vehicle." §13A-5-40(a)(17), Ala. Code, 1975. The only difference between capital murder under § 13A-5-40(a)(17) and felony murder committed by shooting into an occupied vehicle under §13A-6-2(a)(3) and § 13A-11-61(b) is the element of intent. "[F]elony murder does not require intent to kill; the only intent necessary is the intent to commit the underlying felony." George v. State, [Ms. CR-94-387, April 19, 1996],___ So.2d ___ (Ala.Cr.App.), rev'd on other grounds, [No. 1951306, October 25, 1996], ___ So.2d ___ (Ala. 1996). "By definition, a murder must be intentional to constitute a capital offense. §13A-5-40(b)." D.D.A. v. State, 650 So.2d 571, 577 (Ala.Cr.App. 1994) (citing § 13A-5-40(b), Ala. Code 1975).
Under the facts of this case, felony murder based on the felony of shooting into an occupied vehicle is also a lesser included offense of the capital offense of "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct." §13A-5-40(a)(10), Ala. Code, 1975. Here the two victims were shot while they sat inside a vehicle. Again, to support capital murder the state must prove that the shooter had the intent to kill. "[F]elony murder does not require intent to kill; the only intent necessary is the intent to commit the underlying felony." George, supra.
 "Here, the killing was committed during a felony and the effect of the trial judge's instruction was to permit the jury to convict the appellant of the capital offense 'if they found that he either intentionally killed [Houston and King] or that he . . . caused [Houston's and King's] death in the commission of the [felony].
". . .
 ". . . [W]hether the appellant intended to kill the victim[s] during the commission of a [felony] was a question for the jury. . . . [T]he evidence presented by the State would support a conviction for felony murder, which has no intent requirement, as well as a conviction for the charged capital offense."
Starks v. State, 594 So.2d 187, 194-95 (Ala.Cr.App. 1991) (citations and footnote omitted) (defendant convicted of capital murder during a robbery where the evidence was that a killing was committed during a planned robbery but there was no evidence of a plan to kill). "Whether the accused possesses the intent to cause the death of another person is a matter to be determined by the jury." Paige v. State, 494 So.2d 795, 796
(Ala.Cr.App. 1986). The trial court properly included felony murder in its jury charge.
 III.
Mitchell contends that the trial court erred in denying his motion to suppress his incriminating tape-recorded statement. *Page 801 
 "Extrajudicial confessions are prima facie involuntary and inadmissible, and the burden is upon the state to show voluntariness and a Miranda predicate in order for them to be admitted. Lewis v. State, 535 So.2d 228, 234 (Ala.Cr.App. 1988). '[I]nculpatory admissions in the nature of a confession — that is, directly relating to the facts or circumstances of the crime, and connecting the defendant therewith — are subjected to the same rules of admissibility, as direct confessions, and are therefore prima facie involuntary and inadmissible.' McGehee v. State, 171 Ala. 19, 22, 55 So. 159, 160 (1911) (citations omitted). No distinction is made between inculpatory and exculpatory statements. Miranda [v. Arizona], 384 U.S. [436] at 477, 86 S.Ct. [1602] at 1629, [16 L.Ed.2d 694 (1966)]. Exculpatory statements are 'incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver as any other statement.' Id. See also Rhode Island v. Innis, 446 U.S. 291, 301, n. 5, 100 S.Ct. 1682, 1690, n. 5, 64 L.Ed.2d 297
(1980); Arthur v. State, 575 So.2d 1165
(Ala.Cr.App. 1990), cert. denied, 575 So.2d 1191
(Ala. 1991)."
Coral v. State, 628 So.2d 954, 971-72 (Ala.Cr.App. 1992).
Mitchell's written motion to suppress stated the following grounds for suppression: 1) the State did not show the voluntariness of the Miranda[7] predicate; 2) given the totality of the circumstances, the State did not show that the statement was voluntarily and knowingly given without coercion and intimidation; 3) the statement was the fruit of an illegal seizure; 4) the interrogation was not stopped when Mitchell requested an attorney; 5) the circumstances surrounding the statement were coercive because the police allegedly made material misrepresentations to Mitchell; 6) the State failed to prove the statement was voluntary; and 7) Mitchell was not adequately advised of his Miranda rights. After a lengthy hearing on the motion the defense made the following argument in support of its motion:
 "Judge, the only thing that we would say is, our motion sets forth the grounds that we have for the suppression, along with the evidence that we have put on the stand. And it's our contention that Officer Long threatened Atif with a punishment that is not a possibility in this case. We believe that the death penalty is not possible in this case under any circumstances, and therefore, that is why we request Your Honor to make a pretrial determination that the death penalty is not a punishment.
". . .
 "Judge, I looked at my motion to suppress, and we've discussed that in open court, but I am not sure I raised it on my motion. And we would add that additional issue that we believe that because of his age he is entitled to all of the juvenile rights, even though he was over 18, which we admitted on the record."
R. 227-28, 235.
The allegations presented in the motion to suppress were not supported by facts. We have carefully reviewed the testimony presented at the hearing on the motion to suppress and found no error in the trial court's denial of the motion to suppress based on those grounds. Mitchell argued that he was entitled to receive the benefits of the rights contained in Rule 11, Ala.R.Juv.P., also known as the juvenile Miranda rights or "super-Miranda" rights.
Mitchell was over the age of 18 on June 16, 1993, when the crimes were committed. He was 18 years and 6 months old when he gave the taped statement. R. 58. Section 12-15-1(3), Ala. Code, 1975, defines a child as "[a]n individual under the age of 18, or under 19 years of age and before the juvenile court for a matter arising before that individual's 18th birthday." "By statutory definition, Mitchell was not a child. Therefore, Rule 11 [(A), Ala.R.Juv.P.,] has no application." Burks v. State,600 So.2d 374, 377 (Ala.Cr.App. 1991) (on the date of the crime the defendant was 18 years, 2 months, and 6 days old). Mitchell was not entitled to receive the benefits of the juvenileMiranda rights. However, the juvenile Miranda rights were given to Mitchell and the record contains testimony supporting the trial court's conclusion that he received *Page 802 
the benefit of all the rights encompassed in Rule 11.
Officer Johnny Long testified that he arrested Mitchell and that he subsequently interviewed him. According to Long, Detective Corvin[8] read Mitchell his juvenile Miranda rights before he was interviewed as a precaution, in case Mitchell was a juvenile. R. 58. These rights include the right to talk to, or to have present, a parent or guardian at any time during questioning. Long said Mitchell indicated that he understood his rights and he signed a waiver of rights form. The appellant was interviewed until he asked for his father. R. 49. According to Long, once he requested that his father be present, nothing further was said to Mitchell until his father arrived. R. 51, 56-7. His father was located and arrived shortly after Mitchell made the request, and his father was allowed to speak with Mitchell immediately upon his arrival. R. 57. Mitchell's father told the officers that Mitchell wanted to make a statement. On tape, in the presence of his father, Mitchell was again read his juvenile Miranda rights before giving a statement.
Mitchell argues that he was coerced into giving a statement by threats that if he did not he would receive the death penalty. No evidence was presented indicating that Mitchell wascoerced into giving a statement by threat of receiving the death penalty. Long testified that he picked Mitchell up at Mitchell's father's place of business. Long told Mitchell that the police needed to talk to him concerning a homicide. A marked police car transported Mitchell to the police station. According to Long, Mitchell was advised of his rights two times. Detective Corvin read Mitchell his rights at the police station before initiating an unrecorded interview with him. R. 44. Long said that there was no conversation between him and Mitchell until after Mitchell had been advised of his rights and had signed a waiver of rights form. R. 55-56. Long stated that after Mitchell had been advised of his rights, he was told that the offenses involved "a homicide, two people were killed, and that [the police] believed that [Mitchell] might know about it . . . and [the police] were suspicious of him." R. 67. Long stated that he did not tell Mitchell anything about possible punishments at this time. Long said that all conversation with Mitchell stopped when he requested that his father be present and conversation did not resume until his father arrived.
Mitchell was advised of his rights a second time before a taped interview was conducted. R. 51. Long stated that he did not "[d]uring that interview from the time that [he] read [Mitchell] his rights until [he] turned the tape off . . . say anything to [Mitchell] about this [being] a capital case, [and that] he could get the electric chair, or [anything] like that." R. 66-67.
Long said that "at one point," maybe after the interview, Mitchell was advised that this was possibly a case in which the death penalty would be imposed. R. 64. Long testified that he did not threaten Mitchell in order to make him talk to the police. R. 52. The trial court could find, based on the testimony of Detective Long, that Mitchell was not coerced into giving a statement by threats that if he did not cooperate he would be sentenced to death.
Mitchell also contends on appeal that his request for his mother equated to a request for an attorney because, according to Mitchell, at that time his mother had completed law school and was studying to take the Bar examination. There is no merit to this argument. Mitchell's mother was not licensed to practice law at the time of his interview. When Mitchell asked that his mother be present, it did not appear to be a request for legal counsel.
" 'The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parteSingleton, 465 So.2d 443 (Ala. 1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id.' " Coral v. State, 628 So.2d 954, 972
(Ala.Cr.App. 1992) (quoting Lewis v. State, 535 So.2d 228, 235
(Ala.Cr.App. 1988)). We do not find error in the trial court's denial of the motion to suppress. *Page 803 
 IV.
Mitchell contends that the fact that he received three convictions resulting from a single incident violates his constitutional protection against double jeopardy. We do not agree.
 " ' "The Double Jeopardy Clause embodies three protections: 'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The Blockburger [v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932),] test was developed 'in the context of multiple punishments imposed in a single prosecution.' Garrett v. United States, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985)."
 " 'Grady, 495 U.S. at 516-17, 110 S.Ct. at 2090-91, 109 L.Ed.2d at 561. This Court has also held that the Double Jeopardy Clause of the Alabama Constitution, Art. I, § 9, applies only in the three areas enumerated above. Ex parte Wright, 477 So.2d 492 (Ala. 1985).' "
Arthur v. State, [Ms. CR-91-0718, March 8, 1996] ___ So.2d ___
(Ala.Cr.App. 1996) (quoting Ex parte McWilliams,640 So.2d 1015, 1022 (Ala. 1993)).
Here, Mitchell was not prosecuted for the same offense after an acquittal, he was not prosecuted for the same offense after a conviction, and he did not receive multiple punishments for the same offense. Regarding multiple punishments, the trial court considered the verdicts in counts I and II to be advisory and sentenced Mitchell to a sentence of life imprisonment for his conviction of felony murder under count III. " 'In the context of prescribing multiple punishments for the same offense, the United States Supreme Court has stated that "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v. Hunter, 459 U.S. 359, 366,103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).' " Arthur, supra, quotingMcWilliams, 640 So.2d at 1022. By considering the verdicts in counts I and II advisory, in essence the trial court vacated these verdicts and adjudged the appellant guilty of count III and implemented an appropriate sentence for that conviction. We note that the trial court probably chose count III because it encompassed the murder of both victims. The trial court could have allowed the verdicts in counts I and II to stand and imposed a life sentence for each of those convictions.
Mitchell contends that the prosecution should have been required to elect at the end of the presentation of the evidence as to which charge would be submitted to the jury. He argues that he was prejudiced by repeated references to a three-count indictment because it is likely that the jury viewed a multiple count indictment as enhancing his culpability.
 " 'The general rule is that the trial court will not exercise its power to compel an election unless it appears either from the indictment or the evidence that an attempt is being made to convict the defendant of two or more offenses growing out of separate and distinct transactions. Williams v. State, 383 So.2d 547 (Ala.Cr.App. 1979), aff'd, 383 So.2d 564 (1980), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980).'
 "Floyd v. State, 486 So.2d 1309, 1313 (Ala.Cr.App. 1984). See also Stewart v. State, 601 So.2d 491
(Ala.Cr.App. 1992)."
Weaver v. State, 678 So.2d 260, 276 (Ala.Cr.App. 1995), rev'd on other grounds, Ex parte Weaver, 678 So.2d 284 (Ala. 1996). An election was not necessary in this case. Each count of the indictment properly charged Mitchell with a different capital offense. Mitchell was charged with killing Houston by shooting in to a vehicle; he was charged with killing King by shooting into a vehicle; and he was charged with the double murder of Houston and King. These are separate capital offenses and were properly submitted to the jury. Mitchell has not suffered any prejudice on these grounds and we find no error with the trial court's ruling. *Page 804 
 V.
Mitchell contends that he is entitled to an acquittal or a new trial because of alleged prosecutorial misconduct. He argues that the State breached a discovery agreement between the parties by not producing certain material evidence he requested and that the State actively misled him as to the existence of that evidence, in violation of Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). According to Mitchell, the prosecution failed to disclose information gotten as a result of an interview with Isaac Ruffin contrary to the State's representation in open court before trial that the information did not exist. Mitchell contends that Ruffin's testimony was prejudicial because it contradicted Mitchell's version of the events of that night, thus casting doubt on Mitchell's credibility. Also, Mitchell contends that defense counsel would have changed the way they prepared and presented the case had they been made aware of this information.
In a tape-recorded statement given to police on July 23, 1993, Ruffin stated that no one was with Mitchell when Mitchell borrowed and then returned Ruffin's car. However, according to the defense, later that same day Ruffin told Detective Long that someone had been with Mitchell when he borrowed the car. "The knowledge of government agents working on the case, including a deputy sheriff, as to the existence of exculpatory evidence will be imputed to the prosecutor. Sexton v. State,529 So.2d 1041, 1045 (Ala.Cr.App. 1988)." Savage v. State,600 So.2d 405, 407 (Ala.Cr.App. 1992), cert. denied, 600 So.2d 409
(Ala. 1992).
Mitchell contends that he was first made aware of the Ruffin's upcoming testimony when the State alluded to it during opening statements. No objection was made at this time. At trial, Ruffin testified that a short, skinny, dark-skinned male was with Mitchell when Mitchell borrowed and then returned Ruffin's car. R. 368-69, 580. No objection was raised when Ruffin offered this testimony at trial. The defense thoroughly cross-examined Ruffin concerning his statements. The first time an objection was made on the ground that the State had failed to disclose this statement before trial was in Mitchell's motion for a judgment of acquittal made after the State rested. "[T]he appellant failed to properly preserve this issue for our review. No objection was made by the appellant when the admission of this testimony was proposed to the court by the State. . . . The appellant also failed to object when thetestimony concerning the . . . statement was first introduced."Brown v. State, 516 So.2d 882, 887 (Ala.Cr.App. 1987) (the appellant argued that the State had violated a discovery order entered pursuant to his motion for production) (emphasis inBrown).
 " ' "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this [Brady] rule, or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; grant a continuance if requested by the aggrieved party; prohibit the party from introducing evidence not disclosed; or enter such other order as the court deems just under the circumstances." ' "
Robinson v. State, 528 So.2d 343, 346 (Ala.Cr.App. 1986) (quoting Young v. State, 494 So.2d 862 (Ala.Cr.App. 1986)). Instead of bringing this alleged violation to the attention of the trial court, the defense proceeded to trial without requesting any relief. Therefore, the appellant has waived any objection on this ground.
Even if the alleged violation had been preserved, the allegation is without merit because no Brady violation exists in this case.
 " ' "In Brady v. Maryland, 373 U.S. [83] at 87, [83 S.Ct. 1194 at 1196-97, 10 L.Ed.2d 215 (1963)], the Supreme Court held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' To establish a Brady
violation, defendant must show that (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defendant or was exculpatory, and (3) the evidence suppressed *Page 805 
was material to the issues at trial. Ex parte Kennedy, 472 So.2d 1106 (Ala. 1985), cert. denied, 474 U.S. 975, [106 S.Ct. 340, 88 L.Ed.2d 325] (1985). 'Materiality' requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. A 'reasonable probability' is one sufficient to undermine confidence in the result. Pennsylvania v. Ritchie, 480 U.S. 39, [107 S.Ct. 989, 94 L.Ed.2d 40] (1987); United States v. Bagley, 473 U.S. 667, [105 S.Ct. 3375, 87 L.Ed.2d 481] (1985); United States v. Burroughs, 830 F.2d 1574 (11th Cir. 1987), cert. denied, Rogers v. United States, 485 U.S. 969, [108 S.Ct. 1243, 99 L.Ed.2d 442] (1988); Ex parte Dickerson, 517 So.2d 628 (Ala. 1987); Thompson v. State, 581 So.2d 1216
(Ala.Cr.App. 1991)." ' "
Jackson v. State, 674 So.2d 1318, 1362 (Ala.Cr.App. 1993), aff'd. in part, rev'd in part on other grounds, 674 So.2d 1365
(Ala. 1994) (quoting DeBruce v. State, 651 So.2d 599, 622
(Ala.Cr.App. 1993), aff'd. 651 So.2d 624 (Ala. 1994)).
 "The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. United States v. Bagley [, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383-84, 87 L.Ed.2d 481 (1985)]; Giglio v. United States; Ex parte Womack [, 435 So.2d 766
(Ala. 1983)]. 'When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within the general rule.' Giglio v. United States, 405 U.S. at 154, [92 S.Ct. at 766] (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, [1177], 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness."
Williams v. State, [Ms. CR-92-0382, August 23, 1996],___ So.2d ___ (Ala.Cr.App. 1996).
Mitchell has not established that the prosecution suppressed evidence. The prosecution in this case had an open file policy, allowing the defense to review the file and to have access to whatever it contained; there was no indication that defense counsel had any trouble gaining access to any information. The defense called Ruffin as a witness at the hearing on the motion to suppress (R. 610), and it was clear that Ruffin would be a witness for the State at trial. The prosecutor in this case interviewed Ruffin on his own initiative. In McMullin v. State,442 So.2d 155 (Ala.Cr.App. 1983), this Court stated the following.
 "It is also clear from the prosecutor's testimony that his conversation with [the witness] was a product of his own initiative and investigation. Defense counsel was given access to the police report containing the newspaper article that led the prosecutor to telephone [the witness] and was also told that the people next door put out the fire. 'Truth, justice, and the American way do not . . . require the (State) to discover and develop the defendant's entire defense.' United States v. Brown, 628 F.2d 471, 473 (5th Cir. 1980).
 " 'The purpose of the Brady rule is not to provide a defendant with a complete disclosure of all evidence in the (State's) file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him.' United States v. Ruggiero, 472 F.2d 599, 604 (2nd Cir. 1973)."
McMullin v. State, 442 So.2d 155, 158 (Ala.Cr.App. 1983).
The defense had the same access to Ruffin as the prosecution had and could have interviewed him before trial. Also, we assume that Detective Long was available to the defense for questioning. " '[T]here has been no showing that this information was not available to the defense at the time of trial. There is no Brady violation where the information in question could have been obtained by the defense through its own efforts. May v. Collins, 904 F.2d 228, 231 (5th Cir. 1990), cert. denied, 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789
(1991).' Johnson v. State, 612 So.2d 1288 (Ala.Cr.App. 1992)."Jackson v. *Page 806 State, 674 So.2d 1318, 1362 (Ala.Cr.App. 1993), aff'd. in part, rev'd in part on other grounds, 674 So.2d 1365 (Ala. 1994).
It is not apparent that a reasonable probability exists that, had the evidence been disclosed to the defense earlier, the result of the proceeding would have been different. The appellant has alleged that he would have changed his strategy had this information been disclosed to him earlier, but he has not alleged how his strategy would have been different. It is not clear how the cross-examination of Ruffin would have been different had the defense been aware before the opening statements that Ruffin had changed his version of the events of that night. The defense questioned Ruffin on cross-examination concerning the different statements and the defense played Ruffin's tape-recorded statement, in which Ruffin said the appellant was alone when he borrowed and returned the Chevrolet, for the jury. Ruffin was impeached to the extent that the discrepancy between the tape-recorded statement and Ruffin's trial testimony was pointed out to the jury. Therefore, in addition to finding that this issue is precluded from review, we do not find a Brady violation.
 VI.
The appellant contends that the trial court erred in failing to allow him to have a copy of the entire grand jury transcript or, in the alternative, to have a copy of those portions concerning the testimony of witnesses who testified at trial or who could have been exculpatory witnesses. We disagree. The trial court viewed the grand jury transcript and testimony in camera and determined that it contained no exculpatory evidence.
In Arthur v. State, [Ms. CR-91-718, March 8, 1996], ___ So.2d ___, ___ (Ala.Cr.App. 1996), this Court stated:
 "'Before a defendant is allowed to inspect a transcript of a State's witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony . . . the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness' grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant's testimony. In this case no such showing was made and the existence of any inconsistency between the witness' trial and grand jury testimony was never even alleged. . . . Also, there was no showing that the witness' grand jury testimony, if available, was 'of such nature that without it the defendant's trial would be fundamentally unfair.' "
" '. . . .
 " 'Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection . . . to determine (1) whether the statement made by the witness before the grand jury "differed in any respects from statements made to the jury during trial," . . . and (2) whether the grand jury testimony requested by the defendant "was of such a nature that without it the defendant's trial would be fundamentally unfair." . . . This procedure will best preserve and protect the legislative determination that "it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings remain inviolate." Alabama Code 1975, Sections 12-16-214
through 226.'
 "Millican v. State, 423 So.2d 268, 270-71
(Ala.Cr.App. 1982)."
See Mims v. State, 591 So.2d 120, 126 (Ala.Cr.App. 1991). "While it is true that broader discovery is to be allowed in cases involving capital murder because of the possible imposition of the death penalty, Ex parte Monk, 557 So.2d 832,836-37 (Ala. 1989), a defendant must make a preliminary showing of particularized need before a court can balance this need against the policy favoring grand jury secrecy." Arthur v.State, ___ So.2d at ___. Mitchell did not make a preliminary showing *Page 807 
of particularized need for the grand jury information. The trial court correctly denied the motion.
Additionally, Mitchell contends that the grand jury material was needed to challenge the propriety of the proceedings. We agree with the State's argument that the propriety of the proceedings cannot be determined from the testimony of the witnesses and that Mitchell has not alleged with any specificity what improprieties the grand jury committed. We also agree with the State that the appellant's cited authority,Butterworth v. Smith, 494 U.S. 624, 110 S.Ct. 1376,108 L.Ed.2d 572 (1990), does not support his argument on this issue.Butterworth stands for the proposition that a grand jury witness is not forever prohibited from disclosing his or her own grand jury testimony after the term of the grand jury has ended. Butterworth v. Smith, 494 U.S. 624, 626, 110 S.Ct. 1376,1378, 108 L.Ed.2d 572. Butterworth is distinguishable from the present case, where the defense seeks the testimony of all grand jury witnesses on what appears to be a fishing expedition. Mitchell failed to persuade this court that the grand jury material was needed to challenge the propriety of the proceedings. The trial court correctly denied the motion.
 VII.
Mitchell contends that there was a fatal variance between the proof and the indictment. He argues that the indictment charged him with "caus[ing] the death of Demarcus King by shooting him with a pistol." According to Mitchell, the State failed to prove that a pistol was used in the commission of this offense. This, Mitchell argues, is a fatal variance between the indictment and the proof presented at trial. He objected on these grounds for the first time after the jury returned from deliberations for a second charge. This objection was untimely.
Moreover, the facts as alleged by Mitchell do not constitute a fatal variance. "If the weapon described in the indictment, and the weapon proven are of the same nature and character, and inflict the same nature and character of the wound proven inflicted, there is no fatal variance in the allegation of the indictment and the proof." Weaver v. State, 407 So.2d 568, 569
(Ala.Crim.App. 1981) (no fatal variance where the indictment charged that the victim was killed with a .25 caliber automatic rifle, but the undisputed evidence proved that the victim was killed with a .25 caliber automatic pistol); Pace v. State,652 So.2d 321, 325 (Ala.Cr.App.), cert. denied, 652 So.2d 328 (Ala. 1994) (" 'If an indictment alleges the means by which an offense is committed, it must be substantially, although not literally, proven as alleged. If it alleges that the defendant killed the deceased with a knife, it is sufficient if the substance of the allegation be proven; i.e., proof that he killed him with a razor, or an instrument of like kind and character, would be sufficient. Or, if the allegation be that he killed him with a gun, proof that he killed him with a pistol would support it. But the allegation that he killed himby cutting him with a knife would not be supported by proofthat he shot him with a pistol or threw him against a barbed wire fence." ' (quoting Huckabee v. State, 159 Ala. 45, 48-49,48 So. 796, 797-98 (1909) (emphasis in Pace))).
Here the indictment charged that the death of Demarcus King was caused by shooting him with a pistol, but the proof at trial was that King was killed by shots fired from a 9mm. gun. We find no fatal variance between the allegation and the proof.
Based upon the foregoing, we affirm the appellant's conviction for felony murder.
AFFIRMED.
All the Judges concur.
[1] There is no such thing as an advisory verdict in anoncapital case. We consider the trial court's reference to advisory verdicts in this case to be unintentional. The trial court obviously meant that the verdicts in counts I and II were vacated.
[2] King's feet were resting inside the van on the passenger side floorboard and his body extended to the ground outside the van.
[3] Smith said he saw a Volkswagen and some other car that could have been a Buick or a Chevrolet. To avoid confusion we will refer to the car as the Chevrolet.
[4] According to Burrows, "[t]race evidence is the section of the laboratory that deals with numerous different types of physical evidence. That would be in the area of examination of paints and plastics, the examination of soil and minerals, the examination of glass, the examination of tire tracks, shoe impressions, examination of hairs, fibers, multiple items in this discipline." R. 437.
[5] Lieutenant Cooley's first name is not in the record.
[6] "No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury." Rule 21.2, Ala.R.Crim.P.
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[8] Detective Corvin's first name was not found in the record on appeal. *Page 808