On Application for Rehearing

KELLUM, Judge.
The opinion issued on November 2, 2012, is withdrawn and the following opinion is substituted therefor.
The appellant, Everett Bernard Morton, was convicted of one count of murder made capital because it was committed by or through the use of a deadly weapon while the victim was inside a vehicle, a violation § 13A-5-40(a)(17), Ala.Code 1975, and of one count of attempted murder, a violation of § 13A-6-2 and § 13A-4-2, Ala.Code 1975. The jury unanimously recommended that Morton be sentenced to life imprisonment without the possibility of parole for his capital-murder conviction. The trial court followed the jury’s recommendation and sentenced Morton to life imprisonment without the possibility of parole for the capital-murder conviction. The trial court sentenced Morton to 10 years’ imprisonment for the attempted-murder conviction.
The evidence adduced at trial indicated the following. During the evening hours of April 19, 2006, Morton telephoned Patrick Dixon and asked to purchase $10 worth of marijuana from him. Dixon agreed to sell Morton the marijuana and he and Tyrance Byrd drove in Dixon’s green Ford Thunderbird automobile to Morton’s aunt’s house on Hamilton Street in Dothan.[1] When they arrived, Dixon and Byrd were told by then 12-year-old Kahe-era (“Kiki”) Rich to drive around the corner to Fifth Avenue, which they did. At that time, Morton approached Dixon’s automobile and purchased the marijuana from Dixon, giving Dixon two five-dollar bills. Just after the purchase, two armed men wearing bandanas on their faces, who were later identified as Michael James and Marcus Rivers, came out of nearby bushes and approached the vehicle, pointing their weapons at Dixon and Byrd and demanding that Dixon and Byrd hand over all of their money. James and Rivers then began shooting at Dixon’s automobile. Dixon and Byrd were able to speed away from the shooting, but both suffered gunshot wounds, and Dixon ultimately died as a result of his wounds. Testimony indicated that the robbery of Dixon and Byrd was planned by Morton, who asked James and Rivers to help him, so that he could obtain money to pay a debt.
Michael James testified that he lived on Fourth Avenue near Hamilton Street in Dothan, and that he knew Morton, whose aunt lived on Hamilton Street, and Rivers, as well as Dixon, but that he did not know Byrd. According to James, Dixon often sold marijuana in the neighborhood around Hamilton Street. James said that he had purchased marijuana from Dixon on previous occasions. On April 19, 2006, James said, he, Morton, and Rivers were together in the neighborhood. They had been smoking marijuana. Morton told James and Rivers that “he wanted a lick, need a lick,” meaning that Morton wanted to commit a robbery. (R. 1037.) According to James, Morton said that he owed money to someone and that he wanted to rob Dixon. James told Morton that Dixon “was the wrong one” (R. 1043) to rob because “[e]v-erybody knew him.” (R. 1044.) At first, James told Morton that he did not want to participate in the robbery; however, *1070 James subsequently changed his mind and agreed to help Morton rob Dixon. Rivers agreed to help as well. James and Rivers were both armed with black nine-millimeter pistols. James testified, however, that he told Morton that “wasn’t nobody supposed to get hurt” during the robbery and that there would not be any shooting. (R. 1069.) Morton telephoned Dixon to have him come over to the neighborhood so that they could commit the robbery. Morton borrowed $10 from James to purchase marijuana from Dixon in order “to make it look legit.” (R. 1051.) James said that he, Rivers, and Morton agreed that Morton would use body language to signal James and Rivers to begin the robbery.
James testified that he and Rivers hid in the bushes across the street from where the robbery subsequently occurred. Both were wearing black clothing and had bandanas over their faces. James testified that he wore a blue bandana, which signified that he was a member of a gang called the “CRIPS.” (R. 1048.) James could not recall what color bandana Rivers wore. James stated that, from his vantage point in the bushes, he saw Dixon drive his automobile onto Fifth Avenue and that he then saw Morton standing by the automobile. According to James, he saw the overhead light inside the car turn on, saw Dixon “fumbling ... getting the drugs,” and then saw the exchange take place. (R. 1052.) James said that he then “speculated” that he and Rivers were supposed to begin the robbery and they came out of the bushes and approached Dixon’s vehicle. (R. 1053.) Rivers went to the driver’s side of the vehicle and James went to the passenger side. James said that he told the occupants in the vehicle “to put their hands on the roof and don’t move.” (R. 1055.) Rivers also said “don’t move.” (R. 1055.) James then said “don’t test me, brother, just give it up, give it up.” (R. 1073.) James said that when he and Rivers approached the car, Morton backed away. James testified that he was the first to shoot at the vehicle, but that he missed the vehicle and hit the passenger, Tyrance Byrd. James then fired toward Byrd “four or five” more times and Rivers fired toward the driver, Dixon, several times. (R. 1059.) James said that he and Rivers continued firing at the vehicle as it sped away.
James testified that after the shooting he ran home and hid his pistol “in the backyard up under a shed.” (R. 1065.) That pistol was never recovered by the police. Early the next morning, James was arrested by police and taken to the police station. James said that he subsequently gave three statements to the police regarding the shooting. In his first statement, James told the police that he and Rivers were walking home from a friend’s house when they saw Dixon’s car on the side of the road and then saw somebody rob Dixon. In other words, James told police that he and Rivers were only witnesses to the robbery and not the perpetrators. After the police “started pressuring” him, James said, he gave a second statement, in which he said that he and Rivers were walking down the road when they saw Dixon’s car pull to the side of the road and he and Rivers then approached the car and robbed Dixon. (R. 1078.) In neither of his first two statements did James mention Morton’s involvement. However, according to James, he lied to the police in his first two statements because he “was scared and trying to save [himjself.” (R. 1067.) James said that it was only in his third statement that he told the police the truth. In his third statement, James stated essentially the same facts as he testified to at trial. He said that it was Morton’s idea to commit the robbery. He also said that there was no plan for anyone to get hurt and that the *1071 shooting occurred suddenly, when Byrd reached for a gun. However, unlike his testimony at trial, in his third statement, James said that the first time he fired at the vehicle he fired two warning shots, neither of which hit anyone.
James testified that he, like Morton, had been charged with capital murder[2] and attempted murder, but that the district attorney offered him a plea bargain in exchange for testimony against Morton and Rivers. James said that he pleaded guilty to intentional murder as a lesser-included offense of the capital-murder charge and to attempted murder and that he received two concurrent 30-year sentences. James said that, while in prison serving his sentence, he gave a recorded statement to Morton’s defense attorneys. In the statement, James said that Morton was not involved in the robbery and shooting. However, James testified that he had lied to Morton’s defense attorneys. At some point after he gave that recorded statement, James said, he asked a different attorney than the attorney who had represented him on the plea agreement to review his case and, when the district attorney spoke to him about a week before Morton’s trial, James told the district attorney that he believed he could get a better sentence and indicated that he was not going to testify against Morton. According to James, the district attorney then told him that he had violated the terms of his plea agreement and that his guilty pleas were void. The district attorney then indicted James for capital murder during a robbery. James subsequently spoke with the attorney who had represented him on the plea agreement and decided to testify against Morton as required by his plea agreement. James said that his testimony at trial was the truth.
Elishous Townsend, who lived on Hamilton Street two houses away from Morton’s aunt’s house, testified that he knew Morton and James, but that he did not personally know Rivers, although he had heard of Rivers. Townsend said that he knew that Morton smoked marijuana and that he had previously seen Morton purchase marijuana on Hamilton Street, including many purchases from Dixon. Townsend stated, however, that he never saw Morton purchase marijuana near his aunt’s house;. the purchases were always made on another part of the street. On the night of April • 19, 2006, Townsend said, Morton and James were in his front yard and he heard them talking about robbing someone, although neither Morton nor James identified their potential victim. Townsend admitted, however, that in his statement to police, he had said that he had heard James tell Morton that James was “going to rob this fool,” not that James and Morton were both participating in the discussion of a robbery as he testified to at trial. (R. 566.) Later that night, when Townsend was on his front porch with friends drinking and smoking marijuana, he saw Dixon stop in front of Morton’s aunt’s ■house in his vehicle. A young girl, who Townsend estimated to be about 15 years old, approached the car and Townsend saw her point. Townsend testified that Dixon then drove the car around the corner onto Fifth Avenue, at which point Townsend lost sight of the car. Approximately 30 minutes later, Townsend said, he heard about 15 or 16 gunshots. According to Townsend, shortly after the gunshots, Morton, James, and Rivers came running toward his house. Townsend refused to *1072 let them inside his house and told them to “[r]un on up the damn street.” (R. 550.) Townsend said that Morton appeared “spooked” (R. 556) and “hyper, like [his] adrenaline was up.” (R. 550.) Morton, James, and Rivers continued running, and Townsend eventually lost sight of them. Later that night, Townsend again heard gunshots. He said that “[t]hey shot in Morton’s aunt’s house,” but he did not specifically identify who “they” were. (R. 552.) Townsend admitted that when Morton’s attorneys attempted to speak with him, he refused to talk to them. He also said that, after the shooting, he became ' afraid for his safety and he moved. Townsend admitted that he and his family were paid by the District Attorney’s Office for him to testify; specifically, the district attorney’s office paid his family for the gas and food necessary for them to travel to Townsend’s location, pick him up, and transport him to the trial, and it paid both him and his family for wages they lost as a result of taking off work for Townsend to testify. Townsend stated, however, that he did not change his testimony in order to get money.
Kiki Rich, who was 12 years old at the time of the crime and 17 years old at the time of trial, testified that on the night of April 19, 2006, she and two of her younger brothers snuck out of their house to walk to a nearby convenience store to buy “[j]unk food.” (R. 652.) On their way back home, Kiki said, she saw Morton, who she knew, on Hamilton Street. Morton asked her to tell the people in a green automobile parked on the street in front of Morton’s aunt’s house “to pull around the corner.” (R. 657.) Kiki stated that she had seen the green automobile in the neighborhood before, including earlier that day, although she did not know to whom it belonged. Kiki walked to the green automobile and told the two black males in the vehicle to drive around the corner. According to Kiki, she saw the vehicle drive around the corner and stop, at which point she saw Morton approach the driver’s side of the vehicle, place his hands on top of the car, lean over, and speak with the driver. According to Kiki, she then saw Morton “thr[ow] his fingers up” (R. 668), and two black men dressed in black clothing with bandanas on their faces and guns in their hands came out of the bushes, approached the vehicle, and said “[g]ive it. up.” (R. 674.) Kiki described Morton’s hand motion as a “setup.” (R. 670.) However, Kiki testified that she never saw Morton with a gun the night of the shootings and that Morton did not say anything when the two men came out of the bushes with guns. Kiki testified that when the two men with guns approached the car, Morton moved away from the car, and the two men with guns started shooting at the car. Kiki said the car started moving away, but the two men kept shooting at it as it proceeded down the street. When the two men stopped shooting, Kiki said, they ran away. Kiki did not see Morton with them at that time. Kiki stated that she and her two brothers then ran home.
Later that evening, Kiki said, she again left her house and she approached a police officer at the scene of the shooting and told him that she had witnessed the shooting. Specifically, Kiki told the officer that one of the shooters was black and that the second shooter was white. Kiki testified that she had lied to police about the race of the shooters because she was scared. Kiki said that when she first, spoke with the police officer after the shooting and told him that she had been a witness, she did not mention Morton’s name and did not tell him that Morton had given the shooters a signal just before the shooting. Later, when officers came to her house, Kiki said, she lied to the police and told them that it was not her who had spoken *1073 to the officer earlier, that it had been someone else. The following day, Kiki said, after talking with her mother, her mother took her to the police department where she gave a statement to police. Kiki testified that the statement she gave at the police department was the truth. Kiki admitted that she had been charged as a juvenile for obstructing governmental operations in relation to her and her mother’s initial refusal to speak to the police the night of the crime, but she said that the district attorney’s office did not make any promises to her in exchange for her testimony at trial. Kiki admitted that in March 2006, a month before the shooting, she had snuck out of the house and gotten caught and that she then made a report to police that she had been raped at gunpoint. Kiki said that she had gotten pregnant and had a child as a result of the rape.
Tracy Rich, Kiki’s mother, testified that she, her husband, and her five children had moved to Lafayette Street, a block away from Hamilton Street, a little over a month before the shooting. Rich said that in the short time she lived in the area, she saw people fighting and selling drugs and sometimes heard gunshots. Rich said that she knew Morton because, sometime before the shooting, she had seen him trying to talk to her daughter, Kiki, and she had told Morton, who was much older than Kiki, to stay away from her daughter. On the evening of April 19, 2006, Rich said, she was lying in bed when she heard gunshots in the neighborhood. Rich testified that when the shots first started, she “went to see if everybody was in the house” and that all of her children, including Kiki, were in the house at that time. (R. 640.) Shortly after hearing the shots, Rich said, police officers knocked on her front door and she told them that Kiki had been in the house with her when she heard the gunshots and could not have witnessed the shooting. Rich spoke to the officers again later that evening and told them that Kiki “didn’t know nothing about it and she was not no snitch and she didn’t know nothing.” (R. 614.) Rich admitted that she told Kiki not to say anything to the police officers. She said she did this for the safety of her daughter and her family. However, after speaking with Kiki that night and being told by Kiki that Kiki had, in fact, snuck out of the house and witnessed the crime, she telephoned the police and informed them that Kiki would tell them what she had seen. After Kiki spoke with police, Rich said, she began receiving threats. According to Rich, she kept Kiki out of school for two weeks as a result of those threats and subsequently moved, twice, in an attempt to keep her family safe.
Tyrance Byrd testified that in 2006 he was living in Texas, but came back to Dothan a couple days before the shooting. Byrd said that he did not know Morton at all and that he did not personally know James or Rivers, although he, James, and Rivers had “all went to alternative school when [they were] younger.” (R. 958.) On April 19, 2006, Byrd met with Dixon, a friend with whom he often sold marijuana. Byrd said that neither he nor Dixon were armed with weapons that day. According to Byrd, Dixon received a telephone call that evening, after which Dixon told'Byrd that they were going to sell a “dime sack” of marijuana to someone. (R. 960.) Byrd said that he and Dixon had marijuana and approximately $500 in cash in Dixon’s vehicle at the time. Dixon then drove to a residential neighborhood and stopped in front of a house. Byrd testified that a young girl approached the vehicle and told Dixon and Byrd that “my auntie don’t want this type of business in front of her house” and then told them to drive around the corner. (R. 966.) Dixon complied with the request and drove around the *1074 córner, at which point Morton approached the vehicle. Dixon handed Morton a sack of marijuana and Morton paid Dixon. Byrd said that, after the exchange, Morton stood next to the car but didn’t say anything, like he was “stalling.” (R. 968.) However, Byrd said that Morton held the marijuana in his hands and that he never saw Morton do anything else with his hands.
At that point, Byrd said, two black males dressed in dark clothing, wearing blue rags over their faces, and carrying silver guns approached the vehicle. One of the men said “[g]ive it up.” (R. 972.) According to Byrd, Dixon hit the gas pedal, but the vehicle was in park and went nowhere. Byrd said that one of the men then looked at him and said “don’t make me do this,” to which Byrd responded: “I ain’t got nothing, bro, I ain’t got nothing.” (R. 975.) Byrd said that he never heard Morton say anything nor did he see Morton run away. Byrd said that Dixon then reached in his pocket and pulled out money, but that he did not see what happened to the money. According to Byrd, Dixon then put the vehicle in drive and started driving away, at which point the two men began shooting at the car. Byrd and Dixon both ducked down in the car as they drove away. Byrd testified that he told Dixon that he had been “hit” and that he then saw blood on Dixon’s shirt. (R. 986.) Dixon then said that he could not breathe and he started making a “choking sound.” (R. 987.) Eventually, Dixon passed out and Byrd grabbed the steering wheel and swerved the car to avoid hitting a building. The car eventually came to a stop near a cemetery a few blocks away from the where the shooting had occurred. Byrd telephoned emergency 911 on a cellular telephone and an ambulance and police came to the scene. Byrd spoke with the police and told them about the shooting. Byrd, however, did not tell the police at that time that he and Dixon had been selling marijuana at the time of the shooting. Byrd was transported to the hospital where he underwent surgery.
On cross-examination, Byrd admitted that he had, in the past, transported drugs from Texas to Alabama to sell. However, he said that on this trip to Alabama he did not bring any drugs. According to Byrd, Dixon bought him a bus ticket to come to Alabama because Byrd and his girlfriend in Texas had ended their relationship. Byrd also admitted that he was never charged for selling marijuana the night of the shooting.
Charles Jackie Carpenter, Jr., a general surgeon who was working at the Southeast Alabama Medical Center on the night of April 19, 2006, testified that he performed surgery on Byrd to remove bullet fragments that had penetrated his leg. Dr. Carpenter said the fragments had “gone through the bone just below his knee” and had damaged blood vessels and nerves in Byrd’s leg. (R. 730.) According to Dr. Carpenter, the damage to Byrd’s leg most likely would have required amputation of the leg if it had not been repaired within a few hours of the shooting. Dr. Carpenter stated that he gave the bullet fragments to police.
Alfredo Paredes, a state medical examiner, testified that he performed the autopsy on Dixon. Dixon had been shot four times. Specifically, Dr. Paredes stated that Dixon had two entrance wounds on the back of the left shoulder which came from a single bullet that had “split” into two pieces — the metal jacket and the lead core — before it struck Dixon. (R. 885.) Dr. Paredes testified that the jacket fractured two ribs and that the lead core went through the lung, hit the pulmonary artery close to the heart which caused extensive internal bleeding, and came to rest in the *1075 back side of the sternum bone, breaking that bone. Other wounds were to a finger of Dixon’s right hand which fractured the bone, to the lower part of his right leg, and to the inner aspect of his upper left arm. The wounds to his finger, arm, and leg were both entrance and exit wounds, thus indicating that the bullets passed through those appendages. Additionally, Dr. Pa-redes said, all of Dixon’s wounds had hemorrhaging, indicating that Dixon was alive when he received those wounds. Dr. Paredes concluded that the cause of Dixon’s death was multiple gunshot wounds.
Frank Meredith, an investigator with the Dothan Police Department, testified that on April 19, 2006, he was called to the scene of the shooting on Fifth Avenue. Several other Dothan police officers were present at the scene when he arrived. Inv. Meredith said that he and Ferrill Gill, another investigator with the Dothan Police Department, examined the scene and looked for evidence. According to Inv. Meredith, he found 14 nine-millimeter spent bullet casings and shattered glass in the street where the shooting had occurred. The spent bullet casings were found between approximately 30 feet and 80 feet from the corner of the intersection of Fifth Avenue and Hamilton Street. Additionally, Inv. Meredith testified that on May 3, 2006, he went to the Alabama Department of Forensic Sciences (“DFS”) laboratory in Dothan and viewed the Ford Thunderbird automobile that Dixon and Byrd had been in when they were shot. The vehicle had several holes, including one on the passenger side, and the back driver’s side windshield had been shattered.
David Jay, captain of the Investigation Division of the Dothan Police Department, testified that there were three scenes associated with the shooting — the corner of Fifth Avenue and Hamilton Street where the actual shooting took place, the corner of Plant Street and Main Street near a cemetery where Dixon’s vehicle ultimately stopped after the shooting, and the medical center where Dixon and Byrd were taken after the shooting. Cpt. Jay went to all three scenes during the evening of April 19, 2006. At the cemetery, Cpt. Jay said, he saw a large amount of blood in both the passenger and driver’s seats of Dixon’s vehicle. Additionally, the vehicle had several bullet holes and its windows had been shattered. Cpt. Jay testified that by approximately 5:00 a.m. the morning after the shooting, the police had enough information to go to James’s house and arrest James.[3] The record indicates that Rivers was arrested around the same time. Cpt. Jay also testified that he recovered two weapons from a storage building on Zenith Road, a nine millimeter pistol and a .380 caliber pistol.[4] Mattie Rivers, Rivers’s mother and owner of the shed, gave him permission to search the storage shed, and Marcus Rivers was present at the time of the search.
Katherine Reichert, director of the Montgomery laboratory of the DFS and a firearms and tool marks examiner, testified that she received two bullet fragments that had been removed from Dixon’s body, two bullet fragments that had been removed from Byrd’s leg, several spent bullet casings found at the scene of the shooting, two weapons, and several unfired nine-millimeter bullets. Reichert identified State’s Exhibit 1-A as a nine-millime *1076 ter Hi-Point brand semi-automatic pistol and State’s Exhibit 1-B as a Bryco Arms brand .380 caliber pistol. These were the pistols recovered by Cpt. Jay at the Zenith Road storage shed. Reichert test-fired the Hi-Point pistol but was unable to test-fire the .380 caliber pistol because it did not have a firing pin when she received it. Reichert said that she was unable to determine if the bullet fragments recovered from Dixon’s body or the bullet fragments recovered from Byrd had been fired from the Hi-Point pistol. However, Reichert said that one of the bullet fragments recovered from Dixon’s body, a lead bullet core, was consistent with a nominal .38 caliber class bullet. According to Reic-hert, a .38 caliber class bullet can be fired from a .380 pistol, a nine-millimeter pistol, a .38 special pistol, or a .357 magnum pistol. Reichert also testified that 8 of the 14 spent shell casings found at the scene of the shooting had been fired from the nine-millimeter Hi-Point pistol. Reichert said that when she received the Hi-Point pistol, it had five live rounds in it and that the pistol could only hold a maximum of nine rounds; thus, Reichert concluded, to have fired eight shots and still have five live rounds left in the magazine, the Hi-Point pistol had to have been reloaded at some point during the shooting. Reichert said that the other six spent shell casings found at the scene had not been fired from the Hi-Point pistol and could not have been fired from the .380 caliber pistol, but she determined that those six spent casings had been fired from the same weapon.
John Crawford, an investigator with the Dothan police department, testified that he took a statement from Morton around noon on April 20, 2006, the day after the shooting. Inv. Crawford said that Morton voluntarily came to the police station. Before taking the statement, Inv. Crawford advised Morton of his Miranda, rights[5] and Morton signed a waiver-of-rights form and agreed to speak with him. Inv. Crawford said that no threats, promises, or inducements were made to get Morton to make a statement. Inv. Crawford testified that Morton did not appear to be under the influence of drugs or alcohol and that Morton was able to communicate with him. Inv. Crawford testified that James and Rivers had already been arrested by the time Morton turned himself into the police.
In his statement to police, which was introduced into evidence by the State, Morton said that he had telephoned Dixon using a cellular telephone belonging to his cousin, Michael Rogers, and asked to purchase marijuana. Morton said that James, Rogers, and Rivers were present when he telephoned Dixon and that “they,” presumably meaning James, Rogers, and Rivers, had told him to telephone Dixon. (C. 1035.) Morton also said that they had told him that they were going to rob Dixon when he arrived to sell the marijuana to Morton. However, Morton said that he thought they were joking, even though he knew they carried guns. When Dixon arrived in the neighborhood, Morton said, he was inside his aunt’s house and Kiki Rich knocked on the door and told him that Dixon was there. Morton said that immediately after he purchased the marijuana from Dixon, “they jumped outta nowhere and just started waiving the guns ... and I laid on the ground.” (C. 1036.) Morton said that Rivers approached the driver’s side of the car and that James approached the front of the car and that one of them said: “Give it up bitch.” (C. 1037.) Dixon then tried to speed away and James and Rivers started shooting. After the shooting, Morton said, James and Rivers ran to Townsend’s house hollering “we shot him” *1077 and he followed them. (C. 1043.) Morton said that he hollered at James and Rivers asking them “why did y’all shoot 'em” but that James and Rivers did not respond. (C. 1042.) Morton said James then ran to his house and that he (Morton) got in a truck belonging to his cousin, Bobby Rogers (“Bobby”), and so did Rivers. According to Morton, Bobby drove Rivers to his home in Rolling Hills and then drove Morton to his mother’s home in Kinsey.
Morton testified on his own behalf. Morton stated that he knew Dixon and that he had purchased marijuana from Dixon on numerous occasions. On April 19, 2006, his mother dropped him off at his aunt’s house on Hamilton Street late in the afternoon. He went to Townsend’s house, where he saw James and Rivers. According to Morton, James and Rivers indicated that they wanted to rob someone, but they did not know who they wanted to rob. Morton said that James then told him to telephone Dixon so that James could rob Dixon. Morton said that he agreed to call Dixon for James because he “wanted to smoke some marijuana.” (R. 1226.) Morton testified that he telephoned Dixon and asked to purchase marijuana. Morton admitted that he knew that both James and Rivers carried guns on a regular basis. Shortly after making the call, Morton saw Dixon’s car on Hamilton Street. Morton asked Kiki Rich to go to the car and tell Dixon to drive around the corner. After Dixon drove around the corner, Morton approached the car, handed money to the passenger, and received marijuana in return. At that point, Morton said, James and Rivers jumped out of the bushes with guns. Morton admitted that he knew that James and Rivers had been hiding in the bushes, but nonetheless said that he “was in shock” when they jumped out of the bushes. (R. 1233.) James told Morton to lie on the ground and Morton complied. Morton said that James told him to lie on the ground because “[t]hey wanted to make it look like I didn’t have nothing to do with it, because they didn’t plan on killing nobody.” (R. 1287.) Morton testified that, although he was not surprised that a robbery took place, he was surprised at the shooting. While on the ground, Morton said, he heard what sounded like someone “mash[ing] the gas,” but the ear did not move. (R. 1233.) Morton then heard gunshots, saw the car drive away, and saw James shooting at the car as it sped away. Morton said that bullets were ricocheting around him and that he “felt the heat from the bullets.” (R. 1235.) According to Morton, if he had not “moved out of the way, [he] would have been shot too.” (R. 1235.)
After the shooting ended, Morton said, he ran to Townsend’s house, stayed for about 10 minutes and then rode with Bobby to drop off Rivers, after which Bobby took him home to his mother’s house in Kinsey, and he spoke with his mother. Morton told his mother that he had “seen somebody get shot,” that “there wasn’t nothing [he] could do about it,” and that “if we said something, they w[ould] kill us.” (R. 1237.) The following morning, however, Morton voluntarily went to the police station to give a statement. According to Morton, there had never been any discussion between him, James, and Rivers about anyone being shot and he had never told James and Rivers to shoot anyone. On cross-examination, Morton admitted that he did not know whether the weapons James and Rivers possessed were loaded and that he did not ask to see the weapons before the robbery to make sure they were not loaded. Morton also testified on cross-examination that he had written a letter to Dixon’s family apologizing for his involvement in the robbery and admitting that he had made the telephone call that resulted *1078 in Dixon’s coming to the neighborhood where he was shot and killed.
Debra Morton (“Debra”), Morton’s mother, also testified on Morton’s behalf. Debra said that on the night of April 19, 2006, Morton came home “hysterical” saying “that he had seen something happen.” (R. 1166.) Debra said that Morton was “pacing the floor” and “ringing his hands” and that he was “afraid” and “crying.” (R. 1167.) Morton told Debra that he had called Dixon to purchase marijuana. Although Morton did not tell Debra that he had planned or had at least known about the robbery, he told her that he had witnessed the shooting and that James and Rivers were the shooters. Morton also told Debra that, after the shooting, he, James, and Rivers all ran up the street toward Townsend’s house but that Townsend told them to leave. Finally, Morton told Debra that Bobby drove him home after first driving Rivers home, and he warned Debra' that if she said anything about the shooting “they would kill us.” (R. 1186.) Debra testified that she and Morton talked for about an hour after he got home and that she told him that they “would figure it out in the morning.” (R. 1167.) According to Debra, she “held [her] child all night long.” (R. 1167.) The following morning, Debra said, she initially went to the convenience store where she worked to open the store, but then came home and, at Morton’s request, took Morton to the police station to make a statement about the shooting.
The defense also called Carla Woodall, the circuit clerk and custodian of records for Houston County, to impeach the testimony of Tracy Rich that she had moved after the shooting because she was in fear for her and her family’s safety. Woodall testified that county records indicated that Dothan Construction, Inc., had initiated an eviction action against Tracy Rich in 2006, and that Rich had responded to the action on June 21, 2006.
Finally, to impeach the testimony of El-ishous Townsend, the defense called Mike Etress, a sergeant with the Dothan Police Department. Sgt. Etress testified that he took a statement from Townsend regarding the shooting. According to Sgt. Etress, Townsend said in his statement, contrary to his testimony at trial, that he never saw a young girl the night of the shooting. Rather, in his statement, Townsend said that Lashawn Poke, one of Morton’s cousin’s, had told him that there was a young girl involved.
In rebuttal, the State called Marsha Dixon (“Marsha”), Dixon’s mother, to testify. Marsha testified that she never received a letter from Morton apologizing to her and her family.
I.
Morton first contends on appeal that the evidence was insufficient to sustain his convictions for capital murder and attempted murder because, he says, the State failed to prove an essential element of both crimes — that he had the intent to kill. Morton moved for a judgment of acquittal at the close of the State’s case and again at the close of defense’s case, arguing to the trial court, as he argues on appeal, that the State failed to present sufficient evidence of his intent to kill.
““‘In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.”’ Ballenger v. State, 720 So.2d 1038, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim. App.1984), aff'd, 471 So.2d 493 (Ala. 1985). ‘ “The test used in determining *1079 the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’ Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘ “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.’” Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).”
Gavin v. State, 891 So.2d 907, 974 (Ala. Crim.App.2003).
“In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961).
“ ‘[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir.1969); Roberts v. United States, 416 F.2d 1216 (5th Cir.1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967):
“ ‘ “Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry’s words, “ ‘ “ ‘ ... the standard utilized by this Court is not whether in our opinion the evidence and all reason-ablé inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury might reasonably so conclude.’ Williamson v. United States, 5th Cir., 1966, 365 F.2d 12, 14. (Emphasis supplied).”
“‘The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is [to] examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged.’ McGlamory, 441 F.2d at 135 and 136.”
Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Crim.App.1978).
“Section 13A-2-23(2), Ala.Code 1975, provides that ‘[a] person is legally accountable for the behavior of another *1080 constituting a criminal offense if, with the intent to promote or assist the commission of the offense ... [h]e aids or abets such other person in committing the offense.’ ‘[I]n Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the princip[al] wrongdoer.’ Price v. State, 725 So.2d 1003, 1055 (Ala. Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998). ‘The words “aid and abet” encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary.’ Henry v. State, 555 So.2d 768, 769 (Ala. Crim.App.1989). ‘The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence.’ Miller v. State, 405 So.2d 41, 46 (Ala.Crim.App.1981) (citation omitted). ‘The jury is to determine whether the appellant’s participation exists and the extent of it from the conduct of the parties and all the testimony presented.’ Walls v. State, 378 So.2d 1186, 1191 (Ala.Crim.App.1979). ‘Such facts as the defendant’s presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation. may be inferred.’ Sanders v. State, 423 So.2d 348, 351 (Ala.Crim.App.1982).”
Hams v. State, 854 So.2d 145, 151 (Ala. Crim.App.2002).
“[T]he accomplice liability doctrine may be used to convict a non-trigger-man accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony.” Ex parte Raines, 429 So.2d 1111, 1112 (Ala. 1982). “No defendant can be found guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony-murder doctrine.” Ex parte Woodall, 730 So.2d 652, 657 (Ala. 1998). However, “ ‘[i]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’ ” Seaton v. State, 645 So.2d 341, 343 (Ala.Crim.App.1994) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim. App.1986)). Intent “ ‘ “may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.” ’ ” Farrior v. State, 728 So.2d 691, 695 (Ala.Crim.App.1998) (quoting Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting in turn Johnson v. State, 390 So.2d 1160, 1167 (Ala. Crim.App.1980)). “ ‘The intent of a defendant at the time of the offense is a jury question.’” C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App.2001), aff'd, 841 So.2d 292 (Ala.2002) (quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993)). Indeed, “[wjhether the accused possesses the intent to cause the death of another person is a matter to be determined by the jury.” Paige v. State, 494 So.2d 795, 796 (Ala.Crim.App.1986).
In this case, viewing the evidence as set out in detail above in the light most favorable to the State, we conclude that it was sufficient to warrant sending the cases to the jury on the issue of Morton’s intent. Therefore, the trial court properly denied Morton’s motions for a judgment of acquittal.
II.
Morton also raises on appeal several challenges to the trial court’s jury instruc *1081 tions as they relate to the capital-murder charge.[6] Because of our disposition of this case, we need address only one of those challenges. Morton contends that the trial court erred when it refused, over his objection, to instruct the jury on felony murder — with the underlying felony being shooting into an occupied vehicle — as a lesser-included offense of the capital-murder charge. He argues that “[tjhere was abundant evidence that would support a charge of felony murder” and that he was entitled to such an instruction even though he denied committing the offense. (Morton’s brief, p. 68.) Specifically, according to Morton, his own testimony that there had been no discussion with his codefen-dants about shooting or killing anyone and that James had told him that nobody would get hurt, as well as James’s testimony that the first shots he fired at the vehicle were warning shots, among other testimony, supported a charge on felony murder. We agree.
“Felony murder committed by shooting into an occupied vehicle is a lesser included offense to the capital offense of ‘[m]urder committed by or through the use of a deadly weapon while the victim is in a vehicle.’ § lSA-5-40(a)(17), Ala.Code, 1975.” Mitchell v. State, 706 So.2d 787, 800 (Ala.Crim.App.1997). “A felony-murder is committed when a person commits or attempts to commit one of several enumerated felonies, and, in the course of or in furtherance of the crime or in flight from the crime, that person causes another person’s death.” Knotts v. State, 686 So.2d 431, 457 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996). “Felony murder requires an intent to commit the underlying felony,” Saunders v. State, 10 So.3d 53, 95 (Ala.Crim.App.2007), but does not necessarily require an intent to kill. In Heard v. State, 999 So.2d 992 (Ala.2007), the Alabama Supreme Court explained:
“According to Alabama law, a defendant must have the intent to kill in order to be found guilty of a capital offense. § 13A-5-40(b), Ala.Code 1975; Ex parte Woodall, 730 So.2d 652, 657 (Ala.1998) (‘No defendant can be found guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony-murder doctrine.’). Felony murder, on the other hand, does not require the specific intent to kill; it requires only the intent to commit the underlying felony. § 13A-6 — 2(a)(3), Ala.Code 1975; Mitchell v. State, 706 So.2d 787 (Ala.Crim.App. 1997). The absence of an intent to kill, however, is not necessarily an element of felony murder, as contrasted with the intent to kill, which is an element of capital murder.
“In other words, a felony-murder conviction does not require proof that the defendant unintentionally killed the victim, only that the defendant intended to commit the underlying felony. Therefore, it is possible that a defendant intended to kill the victim (the element necessary for the capital conviction) while at the same time intending to commit an underlying felony (the element necessary for the felony-murder conviction). Therefore, the most that can be said of the verdicts finding Heard guilty both of capital murder and of felony murder is that they may be merely inconsistent. These two verdicts are not mutually exclusive; they do not contain mutually exclusive essential elements.”
999 So.2d at 1005 (emphasis omitted).
“ ‘A person accused of the greater offense has a right to have the court *1082 charge on lesser included offenses when there' is a reasonable theory from the evidence supporting those lesser included offenses.’ MacEwan v. State, 701 So.2d 66, 69 (Ala.Crim.App.1997). An accused has the right to have the jury charged on ‘ “any material hypothesis which the evidence in his favor tends to establish.’” Ex parte Stork, 475 So.2d 623, 624 (Ala.1985). ‘[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however[ ] weak, insufficient, or doubtful in credibility,’ Ex parte Chavers, 361 So.2d 1106, 1107 (Ala.1978), ‘even if the evidence supporting the charge is offered by the State.’ Ex parte Myers, 699 So.2d 1285, 1290-91 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998). However, ‘[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.’ § 13A-l-9(b), Ala.Code 1975. ‘The basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture.’ Broadnax v. State, 825 So.2d 134, 200 (Ala. Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002). ‘ “A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury.” ’ Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App. 1996), quoting Anderson v. State, 507 So.2d 580, 582 (Ala.Crim.App.1987).”
Clark v. State, 896 So.2d 584, 641 (Ala. Crim.App.2003) (opinion on return to remand). Even when a defendant denies committing the offense, he or she is entitled to an instruction on a lesser-included offense if there is any evidence to support such a charge. See, e.g., Ex parte Stork, 475 So.2d 623, 624-25 (Ala.1985), and Ex parte Pruitt, 457 So.2d 456, 457 (Ala.1984).
Applying the principles of law set forth above and viewing the evidence in the light most favorable to the defendant as we must, see Ex parte McGriff, 908 So.2d 1024, 1036 (Ala.2004), we hold that the evidence presented at trial, as set out in detail above, warranted a jury instruction on the lesser-included offense of felony murder by shooting into an occupied vehicle. See Mitchell v. State, 706 So.2d 787, 799-800 (Ala.Crim.App.1997). Because the trial court erred in denying Morton’s request for a jury instruction on felony murder by shooting into an occupied vehicle as a lesser-included offense of capital murder by or through the use of a deadly weapon while the victim was inside a vehicle, Morton is entitled to a new trial on the capital-murder charge.
Based on the foregoing, we affirm Morton’s conviction and sentence for attempted murder. However, we reverse Morton’s conviction and sentence for capital murder and remand this case for a new trial.
APPLICATION FOR REHEARING OVERRULED; OPINION OF NOVEMBER 2, 2012, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
WINDOM, P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. Testimony indicated that although Morton lived with his mother in Kinsey, he spent a substantial amount of time at his aunt’s house on Hamilton Street in Dothan.

. It is unclear from the record whether James was indicted for capital murder by or through the use of a deadly weapon while the victim was inside a vehicle, as Morton was, or for capital murder during a robbery.

. The State presented no testimony regarding what that information was or how the police had obtained the information.

. The State presented no testimony regarding how the police discovered the location of the pistols or what led the police to believe that the pistols had been used in the shooting.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Morton makes no argument on appeal regarding the jury instructions as they relate to the attempted-murder charge.