BURKE, Judge.
James Wilbert Smith was convicted of two counts of murder made capital because Smith committed the murders after having been convicted of another murder in the preceding 20 years, a violation of § 13A-5-40(a)(13), Ala.Code 1975. Smith was also convicted of an additional count of murder made capital because two or more persons were murdered by one act or pursuant to one scheme or course of conduct, a violation of § 13A-5-40(a)(10), Ala.Code 1975. Smith was sentenced to life imprisonment without the possibility of parole. This appeal follows.
The evidence at trial established that the victims, Ronnie Pugh and Bertjenski Peterson, were killed at their residence on August 23, 2008. Pugh’s body was discovered on the kitchen floor. Pugh’s hands had been bound behind his back with duct tape and he had two bullet wounds to the back of his head. Peterson’s body was found on the living room floor. Peterson had gunshot wounds to his head, back, and neck. David Owens, an investigator with the Major Crimes Unit of the Huntsville Police Department, testified that there were six or seven shell casings discovered at the crime scene. According to Owens, the shell casings were for two different caliber bullets, a .45 caliber and a .9 millimeter, indicating that at least two weapons had been fired at the scene.
Trinyell Coats, a friend of the victims, testified that on August 23, 2008, at approximately 7:00 in the evening, he became worried when he was unable to get in touch with either of the victims despite repeated telephone calls. Coats went to the victims’ house where he discovered their bodies and contacted the police. According to Coats, the house had been ransacked. Coats stated that “[ejverything was turned over, ripped up. Vents taken off. The counters removed. Refrigerator moved. If it was a shoe box it was turned upside down, emptied out. Dresser drawers emptied. Clothes baskets empty.” (R. 177.) Coats testified that the house had been orderly and clean when he visited earlier in the day. Coats also testified that, the Monday before Pugh and Peterson were killed, their house had been ransacked in a similar manner. Coats stated: “The house was tossed before. But we had to clean it up and everything.” (R. 177.)
Coats further testified that both he and Peterson were drug dealers. Coats stated that it was not unusual for Peterson to have several pounds of marijuana as well as large amounts of cash at his house. According to Coats, Peterson sometimes kept up to 20 pounds of marijuana in a *996 “stash spot.” (R. 181.) Coats stated that a “stash spot” is “a location where if somebody comes in to burglarize the house they won’t be able to find it.” (R. 182.) Coats testified that he had seen “over a hundred” people buy marijuana at Peterson’s house. (R. 195.)
Michael Johnson, a crime scene investigator with the Huntsville Police Department, testified that the house looked as if it had been “rummaged through.” (R. 408.) Johnson stated that it looked as if somebody “was in a hurry looking for something....” (R. 408.) Johnson testified that he collected a pair of scissors that he discovered near Peterson’s body on top of an overturned couch. Subsequent testimony revealed that the fabric on the bottom of the couch appeared to have been cut open. (R. 474.) According to Johnson, there appeared to be drying blood on the blades of the scissors. Johnson also collected samples of what he believed to be blood from a planter in the living room and from two cardboard boxes that were discovered in one of the bedrooms.
Crystal Kissel, a DNA expert with the Alabama Department of Forensic Sciences, testified that she analyzed the blood evidence collected from the crime scene. Kissel stated that she created a DNA profile for each of the samples collected from the scissors, as well as the samples collected from the planter and the cardboard boxes. Those DNA profiles were all identical but did not match the DNA profile of either victim. Kissel testified that she then submitted the unknown samples to the Combined DNA Index System (“CO-DIS”), a nationwide data bank of DNA profiles from various sources. According to Kissel, those unknown samples matched the DNA profile of Wilbert James Smith, whose DNA profile was already stored in CODIS. Subsequent testimony indicated that an additional DNA sample was taken from Smith after his arrest that also matched the DNA from the blood samples collected at the crime scene.
Investigator Owens testified that he became aware of the match from CODIS on January 7, 2009. On January 21, 2009, Owens arrested Smith in Montgomery. Owens indicated that, at the time of the arrest, he noticed a scar or an old cut on Smith’s hand. (R. 497.) Smith did not make any statements to police. However, prior to trial, Smith stipulated to his prior murder conviction as alleged in the indictment.
On appeal, Smith argues that the State failed to present sufficient evidence to establish his guilt beyond a reasonable doubt. Specifically, Smith contends that the evidence was insufficient to establish the element of intent required to sustain a capital-murder conviction. Smith also argues that his constitutional rights were violated when the prosecutor elicited improper comments from a witness regarding Smith’s failure to give a post-arrest statement to police. Finally, Smith contends that the trial court erred by faffing to include certain language regarding accomplice liability in the final jury instructions. We will address each argument in turn.
I.
A review of the record reveals that one of the State’s theories of Smith’s guilt was based on accomplice liability. In response to Smith’s motion for a judgment of acquittal, the prosecutor stated:
“Judge, our theory of this case is based on complicity. I mean I think the evidence would support a conclusion that this act was not committed by one person alone. There are — we know there’s at least two guns being fired. The house is completely ransacked. Two individuals have been subdued and taped *997 up. And it would be beyond — beyond normal occurrence that one person acting alone could have indicated or completed all of this acting alone.”
(R. 527.) In his brief, Smith correctly points out that “[a]n inference of criminal participation cannot be drawn merely from presence; a culpable purpose is essential.” (Smith’s brief, at 33), quoting Greer v. State, 563 So.2d 39, 42 (Ala.Crim.App.1990). According to Smith, the State’s evidence established nothing more than his presence at the scene.
However, the fact that Smith’s blood was found at the crime scene coupled with the location of the blood and the testimony that the blood appeared to be drying at the time the police arrived, established more than mere presence. It established that Smith was cut at or near the time of the shootings with a pair of scissors that were later found near one of the victims on top of an overturned couch that had been slit open. The presence of Smith’s blood on a planter in the living room as well as on two separate boxes in an adjacent bedroom established that, after Smith was cut, he went from the living room into the bedroom.
In addition to that evidence, Investigator Owens testified that Smith had a scar or an old cut on one of his hands when he was arrested several months after the shootings. Furthermore, Trinyell Coats testified that the house had been clean earlier in the day but appeared to have been ransacked when he discovered the bodies. That evidence, when taken together with the blood evidence collected at the crime scene, suggests, at the very least, that Smith was cut with the scissors at or near the time that the victims were shot and their .house ransacked. Additionally, it establishes that, after being cut, Smith went from the living room into an adjacent bedroom.
This Court has held:
“ ‘ “ ‘In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in- a light most favorable to the prosecution.’ ” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.CrimApp.1984), aff'd, 471 So.2d 493 (Ala.1985). ' “‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). “ ‘When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.’” Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).’
“Gavin v. State, 891 So.2d 907, 974 (Ala.Crim.App.2003).
‘“In reviewing a conviction based on circumstantial evidence, this court *998 must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 180 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961).
“ ‘ “[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir.1969); Roberts v. United States, 416 F.2d 1216 (5th Cir.1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir.1967): “ * “ ‘Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry’s words, “ ““ “ ... the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury might reasonably so conclude.” Williamson v. United States, 5th Cir., 1966, 365 F.2d 12, 14. (Emphasis supplied).’
“ ‘ “The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is [to] examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged.” McGlamory, 441 F.2d at 135 and 136.’ ”
Morton v. State, 154 So.3d 1065,1079 (Ala.Crim.App.2013), quoting Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Crim.App.1978).
Furthermore, in regard to accomplice liability, this Court, in Buford v. State, 891 So.2d 423, 428-29 (Ala.Crim.App.2004), held:
“ ‘ “ ‘[t]he mere fact that a person witnesses a crime does not make him an accomplice.’ Nelson v. State, 405 So.2d 392, 397 (Ala.Cr.App.1980), reversed on other grounds, 405 So.2d 401 (Ala.1981). ‘The mere presence of a person at the time and place of a crime is not sufficient to justify his conviction for the commission of the crime.’ Dolvin v. State, 391 So.2d 129, 133 (Ala.Cr.App.1979), reversed, 391 So.2d 133 (Ala.1980). However, ‘if presence at the time and place a crime is committed, in conjunction with other facts and circumstances, tends to connect the accused with the commission of the crime, then the [trier of fact] may find the accused guilty.’ Dolvin, 391 So.2d at 137. ‘[Presence, companionship, and conduct before and after the offense are circumstances from which one’s participation in the criminal intent may be inferred.’ 22 C.J.S. Criminal Law § 88(2)(d) (1961). Gibson v. State, 49 Ala.App. 18, 20, 268 So.2d 49 (1972).
*999 [[Image here]]
“ ‘ “Although mere presence at the time and place of a crime is not sufficient to justify a conviction for the commission of that crime, presence is a factor to be considered by the [trier of fact] in determining the guilt of the accused because ‘mere presence does establish a “material fact, which is the opportunity of defendant to commit the offense.” ’ German [v. State ], 429 So.2d [1138,] 1141 [(Ala.Crim.App.1982) ].
“ ‘ “To make one accused of a crime an accomplice, ‘the State must adduce some legal evidence implying that he either recruited, helped or counseled in preparing the [crime] or took or undertook some part in its commission. Criminal agency in another’s offense is not shown merely by an exhibition of passivity.’ Pugh v. State, 42 Ala.App. 499, 502, 169 So.2d 27 (1964).”
“ ‘Payne v. State, 487 So.2d 256, 261-62 (Ala.Crim.App.1986). See also Webb v. State, 696 So.2d 295 (Ala.Crim.App.1996).’ ”
Viewing the evidence in the light most favorable to the State, it would not have been unreasonable for the jury to have inferred that Smith was present at the crime scene when the victims were shot and that he participated in the ransacking of the victims’ home. Based on the presence of Smith’s blood on the scissor blades coupled with the condition of the house and Investigator Owens’s testimony that the fabric on the bottom of the couch had been slit open, it would have been a reasonable inference for a jury to have concluded that Smith used those scissors to cut the fabric on the bottom of the overturned couch in search of drugs or money. Alternatively, based on the fact that Owens noticed a scar or an old cut on Smith’s hand approximately five months after the shootings, a reasonable jury could have inferred that Smith was cut with the scissors during a struggle with one or both of the victims before they were shot. Furthermore, the manner in which the victims were killed, i.e., the fact that they were shot multiple times and that one of them had been tied up, was sufficient for the jury to infer that Smith intended to kill the victims in the process of looking for something in the victims’ home, potentially drugs or money. See Paige v. State, 494 So.2d 795, 796 (Ala.Crim.App.1986) (“The intent to cause the death of another may be inferred from the attending circumstances.”)
Even assuming, arguendo, that Smith had an accomplice who was the actual trig-german, the manner of the victims’ deaths as well as the condition of the house suggests that Smith and his accomplice intended to kill the victims. Accordingly, the State presented sufficient evidence from which the jury might reasonably have concluded that Smith had the requisite intent for capital murder as charged in the indictment.
II.
Next, Smith argues that the prosecutor improperly “elicited comments from a witness on Smith’s failure to give a statement.” (Smith’s brief, at 34.) In arguing that his constitutional rights were violated, Smith points to the following exchange during the State’s case in chief:
“[Prosecutor]: During your meeting there with the Defendant, Mr. Smith, in Montgomery did you — was he read his rights?
“[Investigator Owens]: He was.
“[Prosecutor]: And did you do that personally or was that done by Investigator Leftwich?
*1000 “[Investigator Owens]: I believe I did. There was a recording of it. But I’m not — I’m not positive on that.
“[Prosecutor]: Okay. And did he indicate he understood those rights?
“[Investigator Owens]: He did.
“[Prosecutor]: Okay. And did he choose to make any statements?
“[Defense counsel]: Judge, Judge.
“THE COURT: Yeah. Approach.”
(R. 498.)
After that exchange, a sidebar conference was held during which defense counsel objected to any questioning regarding Smith’s exercise of his post-arrest right to remain silent. The trial court appeared to agree that such a question was improper and later instructed the jury to disregard the question. Thus, contrary to Smith’s assertion in his brief on appeal, no testimony regarding his post-arrest silence was elicited from a witness. Accordingly, Smith’s argument is refuted by the record and he is due no relief on this claim.
However, even if we construe Smith’s argument on appeal to challenge the prosecutor’s allegedly improper question, that issue is not preserved for appellate review. A review of the record reveals that Defense counsel also moved for a mistrial by stating the following:
“Second of all, in behalf of Mr. Smith, I move at this time for a mistrial. Because, in my view, [the prosecutor’s question] really crosses the line of what is proper. And I don’t think that there’s any instruction Your Honor could now give the jury that would cure the taint, if you will, of that.”
(R. 500.) However, in response to' Smith’s motion for a mistrial, the trial court suggested that' it give the jury a curative instruction to disregard the previous question. Defense counsel ultimately agreed and even formulated his own instruction that the court then gave to the jury. In regard to that instruction, the following exchange occurred:
“THE COURT: Right. I think [defense counsel] is satisfied with this charge.
“[Defense counsel]: Sure.
“THE COURT: And if he’s satisfied with this charge it cures our issues and we’ll just move on. Okay. Give me a moment to reflect on the notes I wrote.
“Lawyers come back up here just a minute. You said this is what you would like for me to say.
“[Defense counsel]: Uh-huh. (Affirmative.)
“THE COURT: It is part of the Defendant’s Fifth Amendment privilege to require the State to prove its case. Do you want me to say that? Or do you want me just to say the Defendant’s exercise of his constitutional right to remain silent is not admissible for any purpose and the jury may not consider it. You must disregard the last question.
“[Defense counsel]: Perfect.
“THE COURT: Okay.
“[Defense counsel]: Just leave it right there. Judge.
“THE COURT: Okay.”
(R. 502-03.) Thus, there was never an adverse ruling on Smith’s motion for a mistrial in which he challenged the prosecutor’s allegedly improper question. ' It is well settled that “ ‘[t]o preserve an issue for appellate review, the issue must be timely raised and specifically presented to the trial court and an adverse ruling obtained.’ ” Cochran v. State, 111 So.3d 148, 153-54 (Ala.Crim.App.2012), quoting Mitchell v. State, 913 So.2d 501, 505 (Ala.Crim.App.2005). An issue is not properly preserved for appellate review when the appellant failed to obtain an adverse ruling. McWhorter v. State, 142 So.3d 1195, *1001 1251 (Ala.Crim.App.2011). In fact, any violation of Smith’s constitutional rights based on the prosecutor’s question was cured by the instruction given by the trial court. Accordingly, that issue is not preserved for this Court’s review.
III.
Finally, Smith argues that the trial court “erred in removing/omitting language from the jury charge on accomplice liability.” (Smith’s brief, at 38-39.) However, in his brief on appeal, Smith concedes that he failed to object to the instruction at trial. Smith argues that, although he was not sentenced to death, this Court should nonetheless review this issue for plain error.
Rule 21.3, Ala. R.Crim. P., provides:
“No party may assign as error the court’s giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.”
Furthermore, in Ex parte Dunaway, 746 So.2d 1042, 1043-44 (Ala.1999), the Alabama Supreme Court held:
“Because the trial court sentenced Dun-away to life imprisonment without parole for the murder of Tressa Patterson, we do not review the conviction for that crime under the same ‘plain error’ standard that we use to review the conviction and the death sentence imposed for the murder of James Patterson.”
Although Smith disagrees with limited scope of plain-error review, “[t]his Court has no authority to overrule Alabama Supreme Court precedent.” Whatley v. State, 146 So.3d 437, 489 (Ala.Crim.App.2011) (opinion on return to remand), citing § 12-3-16, Ala.Code 1975. Accordingly, Smith’s argument is not preserved for appellate review.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.